**NATIONAL LABOR RELATIONS BOARD
v. BALDWIN LOCOMOTIVE WORKS.**

No. 7639.

Circuit Court of Appeals, Third Circuit.

March 23, 1942.

On Rehearing May 6, 1942.

Bertram Edises, of Washington, D.C. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, and Ernest A. Gross, Asst. Gen. Counsel, all of Washington, D. C., on the brief), for petitioner.

William Clarke Mason, of Philadelphia, Pa. (Gilbert H. Montague, of New York City, and Frederick H. Knight and Morgan, Lewis & Bockius, all of Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, MARIS, CLARK, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

The National Labor Relations Board petitions for the enforcement of its order which directs Baldwin Locomotive Works, the respondent, to cease and desist from certain unfair labor practices, to disassociate a company-dominated union, and to post the notices usual in such circumstances. The order eventuated in a proceeding which had been formally initiated by the Board's complaint on charges filed by the Steel Workers Organizing Committee (S. W. O. C.).

Some of the respondent's labor practices which the complaint alleged to be unfair had been committed while the respondent was operating its business as debtor in possession under an order of the United States District Court for the Eastern District of Pennsylvania in a reorganization proceeding under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. A plan of reorganization was approved therein by the District Court and a decree and order discharging the respondent from bankruptcy was thereafter entered. Several months later the complaint herein was filed.

A hearing on the complaint was duly had before a trial examiner. The respondent appeared in the hearing and was represented throughout by counsel, as were also the Board, the S. W. O. C., and a local labor organization known as the Federation of Baldwin Employees, which was formally granted leave to intervene. The hearing extended over a number of months during which time more than sixteen thousand pages of testimony were taken.

The respondent opposes the entry of a decree enforcing the Board's order on the ground that (1) the respondent is not chargeable with unfair labor practices which occurred while its property and business were being managed and operated by it as the debtor in possession under order of the District Court in the reorganization proceeding, (2) the Board's findings of fact are not supported by substantial evidence, (3) the Board's order is invalid and improper, and (4) the respondent was denied the full and fair hearing which due process requires.

The Board's jurisdiction of the subject-matter of the complaint (except for what occurred during the reorganization proceeding) is not questioned, nor could it well be. The Board found, and it is undisputed, that the respondent, a Pennsylvania corporation, having its principal offices and plant at Eddystone, Pennsylvania, was engaged in interstate commerce throughout the period covered by the complaint and was, therefore, subject to the provisions of the National Labor Relations Act. The legal conclusion gave proper effect to the fact thus competently found.[1]

On the merit of the charges in the complaint as supported by the evidence, the case is a relatively simple one in the narrowness of the questions involved. But the mistaken zeal of respondent's trial attorney in endeavoring to obfuscate the matter which the complaint had properly put in issue succeeded to the point where the consequent voluminous record bristles with exceptions. Many of these are now urged upon us by reference to numerous record-page citations in support of the respondent's contentions that the trial examiner was biased and prejudiced and that he denied the respondent an opportunity to litigate justiciable issues.

The respondent also complains that the Board availed itself of the services of subordinates in assembling from the record the matter which it accepted as the factual basis for its findings. From this, the respondent argues that the Board's method of arriving at its decision amounted

---

[1] National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226.

to a denial of due process. Before coming to the merits of the Board's order we shall treat first with the question as to whether the respondent is chargeable with the labor practices pursued by it while debtor in possession of its plant and business in bankruptcy, as well as the respondent's assault on the trial examiner's conduct and the course pursued by the Board in deciding the matter.

The complaint, which was filed on December 21, 1938, alleged the commission, inter alia, of unfair labor practices by the respondent between February 25, 1935 (the date of the filing of the respondent's petition for reorganization in bankruptcy) and September 23, 1938 (the date of the respondent's discharge from the bankruptcy proceeding). A plan of reorganization, approved by the District Court on September 1, 1937, had been duly effectuated.

Even though some of the unfair labor practices with which the respondent is charged were committed while it was managing and operating its business and properties as the debtor in possession under court order, it will hardly be denied that a debtor in possession is responsible for the unfair labor practices which occur during a reorganization. Its status as an employer is no different, so far as the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., is concerned, than that of any other employer. Court supervision of corporate reorganization affords the operating possessor no freedom from its statutory duty to its employees.[2] And, where managerial control and economic interest of the debtor in possession and the reorganized company are the same, it could be only the blindness of formalism that would suggest separately instituted proceedings against the predecessor and the successor for the redress of their respective but continuous unfair labor practices. In National Labor Relations Board v. Colten,

6 Cir., 105 F.2d 179, 183, it was said that "* * * the strife which is sought to be averted is no less an object of legislative solicitude when contract, death, or operation of law brings about change of ownership in the employing agency." Nor is the legislative solicitude any the less where the ownership of the employing agency undergoes no substantial change upon reorganization. "An employer cannot be permitted, by reorganization or transfer, to nullify the Board's order and make it necessary to start new proceedings against the new owner of the business." Bethlehem Steel Co. v. National Labor Relations Board, App.D.C., 120 F.2d 641, 650, 651. In Southport Petroleum Co. v. National Labor Relations Board, 62 S.Ct. 452, 456, 86 L.Ed. ——, the Supreme Court recently held a Board order against a predecessor in interest to apply equally to the successor, proof of "a bona fide discontinuance and a true change of ownership" being wanting. Indeed, the respondent concedes, as it must, that, where a complaint for unfair labor practices has issued against a predecessor, the proceeding may be continued against the successor.[3] Can the successor be any less responsible for the predecessor's unfair labor practices where the complaint issues against the successor? We think not. The crucial matters are the commission of the unfair labor practices and the identity of interest of the employing agencies which perpetrated them.

In the present instance, the only change effected in the debtor by the reorganization was a readjustment of its bond and capital structures.[4] The claims of creditors (other than bond) were unaffected; and, except for the retirement of one officer, the respondent's executive personnel and management were of the same group as they had been while the company was the debtor in possession.[5] In no legally

---

[2] See Finletter, The Law of Bankruptcy Reorganization (1939), at pp. 205, 206, for a cogent discussion of the matter.

[3] Bethlehem Shipbuilding Corp. Limited, v. National Labor Relations Board, 1 Cir., 114 F.2d 930, 933; Union Drawn Steel Co. v. National Labor Relations Board, 3 Cir., 109 F.2d 587, 594; National Labor Relations Board v. Colten, 6 Cir., 105 F.2d 179, 182.

[4] In a registration statement filed with the Securities Exchange Commission on August 6, 1937, the respondent averred

that "No material change is to be effected pursuant to the Plan in the general character of the business of the registrant [respondent] * * *." Board's Appendix, pp. 954–958.

[5] Charles D. MacGillivray, who was Vice-President and Secretary of Baldwin Locomotive Works before, during and after the reorganization in bankruptcy, was called as a witness by the respondent at the start of the hearing in connection with motions to quash made by respondent's trial counsel. MacGillivray testified that on October 1, 1938, a week following

significant sense, therefore, can the respondent be differentiated from the debtor in possession so far as the employer-employee relationship is concerned. Manifestly, this works no injustice to the present respondent. As already pointed out, even the claims of general creditors were wholly unimpaired by the reorganization and the same employing corporation which entered that proceeding emerged therefrom with the same management and control intact.

In reality, except for the back pay provisions of the Board's order, the question of the reorganized company's responsibility for its unfair labor practices while debtor in possession is presently academic. The record discloses conduct on the part of the respondent, following its emergence from the reorganization proceeding, of itself sufficient to sustain the charges of the complaint. The question therefore is merely what effect did the debtor's discharge in the reorganization proceeding have upon the reorganized company's liability for back pay. The answer is that it had none.

The Board's order of reparation constitutes something other than an ordinary debt. The power to award back pay, which the statute authorizes, exists for and is exercised in the public interest. See Agwilines, Inc., v. National Labor Relations Board, 5 Cir., 87 F.2d 146, at page 150, where the Court of Appeals aptly said that "The procedure the statute outlines is not designed to award, the orders it authorizes do not award, damages as such. The proceeding is not, it cannot be made, a private one to enforce a private right. It is a public procedure, looking only to public ends. The statute has in mind the maintenance and furthering of industrial amity, and therefore peace, the prevention of industrial war." See also National Labor Relations Board v. Newark Morning Ledger Co., 3 Cir., 120 F.2d 262, 267, 268,

137 A.L.R. 849. The deterrent function of the back pay award in inducing general obedience to the Labor Relations Act has been noted.[6] In the very nature and purpose of the power which the Board exercises in laying a charge for back pay upon an offending employer, such power must needs be unembarrassed by an intervening plan of reorganization concerned with the readjustment of the same employer's liability for its private obligations.

The jurisdiction of a United States District Court in bankruptcy does not embrace the power to treat with a debtor's unfair labor practices which affect commerce. Nor is such a court's leave to the Board to proceed in appropriate manner required. By Section 10(a) of the National Labor Relations Act the Board is expressly empowered to prevent any person from engaging in any unfair labor practices affecting commerce; and that power is exclusive in the Board and unaffected "by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise." The Act moreover explicitly removes the possibility of any restraint upon the Board's power which might be thought to arise where the employer's properties and business are operated under an order of a District Court in a reorganization proceeding in bankruptcy.[7]

We conclude therefore that under the circumstances shown in this case the respondent is chargeable on the complaint of the Board with the unfair labor practices committed while the ultimately reorganized company was operating the business and properties as the debtor in possession and that the Board's power to dissipate the unfair practices is wholly unaffected by the reorganization proceeding.

The respondent's assertion that the trial examiner was biased and preju-

the company's discharge in the reorganization proceeding, George Houston, President of the company, resigned and Charles E. Brinley, who had been a voting trustee under the reorganization plan since April preceding, became President. According to the witness, in "the day to day management" of the company, Brinley was the only man that had been brought in from the outside since 1935.

[6] Note, Back Pay Orders under the National Labor Relations Act (1939) 48 Yale Law Journal 1265.

[7] Section 14 of the National Labor Relations Act provides that "Wherever the application of the provisions of section 77B [207 of Title 11], paragraphs (l) and (m) [reorganization provisions], conflicts with the application of the provisions of this Act [sections 151–166 of this title], this Act [such sections] shall prevail: Provided, That in any situation where the provisions of this Act [sections 151–166 of this title] cannot be validly enforced, the provisions of such other Acts [section] shall remain in full force and effect."

diced is utterly lacking in merit. An examination of the record clearly indicates that the offender against due and orderly trial procedure was in reality respondent's trial attorney, whose apparent desire from the outset of the hearing was to goad the examiner into unjudicial words or conduct. Fortunately, counsel's efforts in such regard failed of success. That the course he pursued, however, was in fulfillment of a predetermined hostile design is evidenced by the fact that by answer antedating the hearing, and filed on the first day of the hearing before any testimony on the complaint had been taken, counsel had his client (the respondent) charging "the Board, its members, officers, agents and employees" with "partiality and active aid to the persons and organizations (including their affiliates) on whose charge the Board instituted this proceeding * * *".[8] Nor did respondent's trial attorney long delay in acting out the role which he had thus prematurely foreshadowed. During the examination of the first witness for the Board (an officer of the respondent company) over a matter no more disputable than the production of company records relating to the character of its business, respondent's trial attorney promptly ascribed the examiner's rulings to bias and prejudice and as constituting a denial of due process in violation of the Fifth Amendment of the Constitution.[9] From then on and almost continuously throughout the lengthy proceeding respondent's trial attorney repeatedly hurled the charge of bias and prejudice in connection with his exceptions to rulings, when even a bare exception was hardly necessary. The ex-

aminer stated early and a number of times that a continuing exception to each and every adverse ruling would automatically be allowed the respondent. Yet counsel continued to impugn the examiner's integrity, invariably parroting his charge according to a uniform pattern of expression.[10] But, not once did he even suggest his own faith in the imputation by moving to disqualify the examiner,—the effective means for eliminating bias and prejudice where, in fact, it is believed to exist. Bethlehem Steel Co. v. National Labor Relations Board, App.D.C., 120 F.2d 641, 652, 653. Notwithstanding a lack of appropriate power, in aid of orderly procedure, to deal with counsel's contumacy directly and adequately, the examiner none the less exercised commendable restraint under the aggravating circumstances and proceeded with the hearing fairly and impartially to the conclusion thereof. It therefore comes with little grace for the respondent now to urge upon us its trial attorney's own partisan imputation of bias and prejudice as being fatal to the proceeding.

The issues which the respondent says it was prevented by the examiner from litigating related to immaterial and irrelevant matter which in some instances amounted to scandal and impertinence. This, respondent's trial attorney endeavored to inject into the case by a prolix answer which for the most part was wholly unresponsive to the complaint. Paragraph 29, quoted in full in footnote 8, supra, is a fair illustration. On motion duly made by counsel for the Board before any testimony was taken, the examiner properly

[8] Paragraph 29 of the respondent's answer to the complaint was as follows:

"29. Notwithstanding said requirements of the Act, the attitude and conduct of the Board, its members, officers, agents and employees, have been marked by such interest, sympathy, partiality and active aid to the persons and organizations (including their affiliates) on whose charge the Board instituted this proceeding and to the general class of such persons and organizations, and by such bias against respondent and Federation and against the general classes to which respondent and Federation respectively belong, as to deprive respondent of life, liberty and property without due process of law in violation of the Fifth Amendment of the Constitution. The deprivation above mentioned is not less, but in-

deed is greater, if as is suspected the Board is partly unconscious in its attitude and conduct above described."

[9] While personal bias is good cause for disqualifying a judge or other trial officer, unless the bias be prompted or supported by "a direct, personal, substantial, pecuniary interest" in the conclusion to be reached, no question of constitutional validity is thereby involved. Tumey v. Ohio, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749, 50 A.L.R. 1243.

[10] The usual form of exception was as follows:

"Mr. Montague [respondent's "sole trial attorney"]. I respectfully except, on the ground that your Honor is evincing an attitude of bias and prejudice, and also a denial of due process under the fifth amendment of the Constitution."

struck the irrelevant and immaterial matter from the respondent's answer; and, thereupon, he stated of record, succinctly and correctly, the issues to be litigated in the light of the complaint. Thenceforth, he rightly excluded the respondent's offers of proof of the matter stricken from the answer.

The examiner's refusal of the respondent's request for subpoenas was warranted. The witnesses whom respondent's trial attorney thus sought to summon,[11] he intended to use in an effort to build up a record of irrelevancy and immateriality, as the stricken portions of the answer clearly envisioned. The examiner's action with respect to the particular subpoenas requested properly served to confine the hearing to the issues and, at the same time, it eliminated nothing that was either material or relevant to the case.

Complaint is made of the fact that the examiner at times interrogated witnesses. The respondent suggests that this was done out of hostility to it, but we are cited to no single instance throughout the extensive record that would justify the respondent's insinuation. It is an examiner's duty to develop the facts material to the issues, and to that end he is authorized "to call, examine and cross-examine witnesses and to introduce into the record documentary or other evidence". See Section 24 of Rules and Regulations, Series 1, as amended, promulgated by the National Labor Relations Board pursuant to authority contained in Section 6(a) of the National Labor Relations Act and in force at the time of the hearing. 1 N.L.R.B. 1032–1037.[12] See, also, Bethlehem Steel Co. v. National Labor Relations Board, App.D.C., 120 F.2d 641, 652, where it was said that,—"It is the function of an examiner * * * to see that the facts are clearly and fully developed. He is not required to sit idly by and permit a confused or meaningless record to be made." The examiner, therefore, acted within his authority in interrogating witnesses.

Nor did the examiner err when he refused to permit respondent's trial attorney to impeach witnesses by interrogating them with respect to their arrests without conviction for crime and their tendency to drink intoxicating liquors, etc. By limiting counsel, in such connection, to a showing of convictions for felony or misdemeanors amounting to crimen falsi, the examiner acted in accordance with a well recognized rule of evidence. See United States v. Montgomery, 3 Cir., 126 F.2d 151.

It is now urged by the respondent that the Board was biased and prejudiced just as the stricken paragraph of the answer had alleged. To support the charge the respondent relies on articles written and speeches made by members of the Labor Board. But nowhere is there an allegation or showing that either the Board or any member thereof ever acted in respect of the subject-matter of the instant complaint other than officially and directly. The case of Berkshire Employees Ass'n, etc., v. National Labor Relations Board, 3 Cir., 121 F.2d 235, is therefore not in point; and the current charge of bias and prejudice stands unsustained.

The respondent asserts that the Board did not read or consider the evidence in this case but relied entirely for its findings upon an analysis of the testimony and documentary proofs, and recommendations, made by attorneys in its "review section". This charge the respondent rests upon inferences which it draws from testimony given by Board members and employees before a special investigating committee of the House of Representatives and from the speeches made or articles written by Board members. The respondent points to no direct proof in the record now before us which discloses what course the Board pursued in considering the testimony, in making its findings of fact, or in arriving at its decision in this case.

However, we may well assume that the Board did avail itself of the serv-

---

[11] The request for subpoenas submitted by respondent's trial attorney designated, inter alia, two members of the National Labor Relations Board, John L. Lewis, Chairman of the C.I.O., Philip Murray, Chairman of the S.W.O.C., and John Doe (the real name being unknown), chief executive officer of Amalgamated Asso. of Iron, Steel and Tin Workers of North America. Counsel also asked a subpoena duces tecum on Chairman Madden, summoning documentary matter some of which related to the work of the Board and some to Mr. Madden.

[12] Section 24 of the Board's Rules and Regulations, Series 1, as amended, is carried forward as the same section in the Board's current Rules and Regulations, Series 2, as amended.

ices of subordinates in familiarizing itself with the material evidence and in arriving at the findings whereof its conclusions are predicated. Such action does not constitute a want of due process. In Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288, it was said that the rule as to the hearing necessary to insure due process "does not preclude practicable administrative procedure in obtaining the aid of assistants in the department. Assistants may prosecute inquiries. Evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates. Argument may be oral or written. The requirements are not technical. But there must be a hearing in a substantial sense." Wherever the question of due process has been raised in regard similar to the present, it has been answered adversely to the respondent's contention.[13] The very exigencies of the Board's situation, because of the character and scope of the work imposed in the discharge of the duty which Congress has placed upon it, require that the courts do not lightly impute want of due process to the Board's mode of procedure simply because it happens to be an administrative body. As was said in National Labor Relations Board v. Biles Coleman Lumber Co., 9 Cir., 98 F.2d 16, 17, "It is obvious that such an administrative body, with scores of cases for its decision, many involving complicated questions of fact and often intricate questions of law, properly will rely upon its employees for assistance in their preparation. The administrative duties imposed on the Board by the Congress could not proceed otherwise."

■ In determining what course the Board may follow and, yet, not offend against constitutional inhibitions, it would be bootless to enter upon a discussion as to the relative merits or constitutional validity of the court-tradition and institutional concepts of administrative procedure. For, while "a 'full hearing' has obvious reference to the tradition of judicial proceedings" (Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 911,

80 L.Ed. 1288), we may not dogmatically tell the Board that it must "hear" in some one particular manner so long as it does "hear", i.e. consider the evidence and argument. The question is not what procedure a court might favor but whether the procedure actually followed by the Board was violative of due process. The responsibility for the administration of the National Labor Relations Act lies exclusively with the Board. So long, therefore, as the Board's procedural methods do not violate constitutional restraints, the right to choose the method is the Board's. What the courts may and do determine, on petitions to enforce or to set aside Board orders, is whether the Board's procedure in given circumstances comported with the requirements of due process. And, thus, court decisions do tend automatically to delineate more specifically from time to time the course which the Board may pursue and keep within constitutional bounds, but that is as far as the courts can properly go in directing Board procedure. They may not "probe the mental processes" of an administrative officer "in reaching his conclusions if he gave the hearing which the law required". Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 999, 82 L.Ed. 1129.

Whether there was due process in this case depends, therefore, upon whether the respondent was accorded the hearing which the law required. From the record before us, we are unable to see how the answer could possibly be otherwise than in the affirmative.

A charge of unfair labor practices by the respondent which was sufficient under the Act (Consumers Power Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 38, 42) was duly filed with the Board. The Board's complaint, which specified the charges in detail, thereupon issued against the respondent. In due course a hearing on the complaint was begun before a trial examiner. The respondent by its trial attorney actively participated in the hearing throughout the five months which it endured. Immediately following the settlement of the pleadings after the re-

[13] Bethlehem Steel Co. v. National Labor Relations Board, App.D.C., 120 F.2d 641, 653; Bethlehem Shipbuilding Corp. v. National Labor Relations Board, 1 Cir., 114 F.2d 930, 942; National Labor Relations Board v. Lane Cotton Mills Co., 5 Cir., 108 F.2d 568, 570; Inland Steel Co. v. National Labor Relations Board, 7 Cir., 105 F.2d 246, 251; Cupples Company Manufacturers v. National Labor Relations Board, 8 Cir., 103 F.2d 953, 957, where the court said: "The Board is not precluded from obtaining aid of assistants."

spondent's motions to quash the complaint[14] and the motion to strike portions of the respondent's answer had been disposed of, and before any testimony in relation to the charges had been taken, the examiner correctly stated for the record in the presence of respondent's trial counsel the charges to be litigated. From then on the respondent by its trial attorney cross-examined the Board's witnesses and called and examined witnesses. Surely, the respondent cannot justly say that it was not given an "opportunity to know the claims of the opposing party and to meet them". Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 999, 82 L.Ed. 1129. After the hearing had been concluded the examiner filed an intermediate report to which, as well as to the record, the respondent filed exceptions which the Federation also adopted for its own. The matter was argued orally before the Board by respondent's trial counsel, inter alia, who filed an extensive brief thereon *with the Board*. Thereafter, the Board entered its decision and order and the findings of fact and conclusions of law whereon its order was based.

 We may not assume that the Board neither considered the evidence nor read the respondent's brief (cf. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 228, 59 S. Ct. 206, 83 L.Ed. 126), nor may we in such circumstances "probe the mental processes" of the Board "in reaching [its] conclusions" Morgan case, supra. In the Consolidated Edison case, supra, there was no intermediate report by the examiner to which the petitioner could file exceptions, nor was the petitioner accorded an oral argument before the Board. Yet the Court of Appeals for the Second Circuit said (95 F.2d 390, 395) that "* * * it must be presumed that their [petitioners'] brief submitted to the trial examiner came to the Board's attention * * * [and] though we do not commend such procedure, we cannot say that it has deprived the petitioners of due process of law." In affirming the decree there entered, the Supreme Court said that it could not say on the record in the case that the Board did not consider the evidence or the petitioners' brief, loc. cit. supra. We, likewise, do not commend the

procedure followed in the Consolidated Edison case, but the decision is none the less important as showing what has been considered not to be a want of due process. A fortiori, there was no want of due process in the instant case. In all respects, the respondent had the hearing before the Board which the law required. See National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 342, 60 S.Ct. 918, 84 L.Ed. 1226.

We have then for consideration the merit of the Board's order. The evidence shows that in 1933 the works manager of Baldwin Locomotive Works initiated the organization of Baldwin Association, an employee representation plan covering all employees of Baldwin at its Eddystone plant exclusive of the employees in the foundry division. About the same time the general manager of the foundry division organized Baldwin Foundries Association under a like employee representation plan for the employees in the foundry division. All of this was done shortly after the passage of the National Industrial Recovery Act of 1933, 48 Stat. 195. Both organizations received financial support and other assistance from Baldwin.

The plans of representation were of the familiar type of employee organization under employer-aegis which was widely adopted by iron and steel companies throughout the country immediately following the enactment of the National Industrial Recovery Act. See Roebling Employees Ass'n, Inc., v. National Labor Relations Board, 3 Cir., 120 F.2d 289, 290. The concession to the mandate of Section 7 of the National Industrial Recovery Act thus implied was noted by this court in Republic Steel Corporation v. National Labor Relations Board, 3 Cir., 107 F.2d 472, 474, modified on another point 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 60.

The Board's findings that both the Association and the Foundries Association were the creatures of Baldwin and were under its domination and control have substantial support in the evidence. And that condition undeniably endured until May 1937, notwithstanding that the National Labor Relations Act outlawing company unions had been enacted on July 5, 1935. But, by May 1937, the need for a different tack in the company's course

---

[14] Practically the first hundred pages of the transcript of the hearing are taken up with motions by respondent's trial attorney to quash the complaint, the argument thereon and the action taken by the trial examiner.

toward employee unionization could no longer be ignored. The constitutionality of the National Labor Relations Act had just been authoritatively confirmed. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. What subsequently transpired with respect to the evolution of the new Federation from the old Associations, without break in the respondent's domination and control, fully supports the Board's findings with respect thereto.

On May 11, 1937 (the S. W. O. C. in the meantime having begun to organize the employees in Baldwin's Eddystone plant), the general committee of the Association was called together and was told by William H. Chesnut, Baldwin's industrial relations manager, that the Associations were illegal under the Act and that they would have to "break up". The employee representatives inquired of Chesnut about forming another labor organization and were advised by him to consult a lawyer, Chesnut recommending for that purpose any one of three lawyers or law firms which he named. The employees who were active in the formation and establishment of a new union at Baldwin were the leaders of the old Associations. Some of them held minor supervisory positions with the company. Among them were so-called contractors who supervised the work done by employees and, although they did not have the power to hire or fire, it does appear that their recommendations to the foremen along such lines were not unacceptable.

On May 13, 1937, these employee leaders engaged an attorney (one of those recommended by Chesnut) to draft a constitution and by-laws for the new union (the Federation). Membership cards were designed and the printing of them was arranged for. And, on the same day both of the Associations were dissolved. No mention of dues having been made on the application cards, after the cards had been printed, the representatives of the Federation at their attorney's suggestion obtained a stamp and put on the top of each application card the words and figures "Dues 25¢". In its insignificance, this sum is not wholly without significance, if maintenance of union organization or payment of possible benefits be contemplated. See Titan Metal Mfg. Co. v. National Labor Relations Board, 3 Cir., 106 F.2d

254, 259, certiorari denied 308 U.S. 615, 60 S.Ct. 260, 84 L.Ed. 514.

The membership drive in behalf of Federation was begun on May 17, 1937. In the course of that undertaking, sponsors of Federation made remarks to employees derogatory to any outside union. It further appears that the actors in behalf of Federation solicited memberships among employees during working hours and on company property,—a fact which justified the Board's inference that this was done with company permission and approval.

The evidence further shows that Baldwin had utilized the services of Pinkerton's National Detective Agency, Inc., to spy on the union activities and the labor affiliations of its employees in 1935, 1936, and as late as May 31, 1937. Richard Wuest, who was plant engineer for Baldwin, participated in efforts to spy upon the meetings of the S. W. O. C. and was also instrumental in the distribution of anti-union pamphlets among the employees.

Aside from what the direct evidence showed, it was for the Board to draw the reasonable inferences from the testimony. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368. The Board's finding that the Federation was but a successor of the Associations and subject to the same uninterrupted company domination and control was a legally permissible conclusion from the facts shown, viz., the formation of Federation by the leaders of the old Associations; Baldwin's failure to mark a "line of fracture" between the old and new unions; the extensive and open use of company time and property for the furtherance of Federation; the active participation of contractors and other supervisory employees in promoting Federation; and the company's manifested hostility to "outside" unions as evidenced by its late sponsorship of company unions, its use of spies on its employees' labor activities and its discrimination against union members. Cf. National Labor Relations Board v. Link-Belt Co., supra; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; and Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, 2 Cir., 112 F.2d 657, affirmed per curiam by the Supreme Court, 312 U.S. 660, 61 S.Ct. 736, 85 L.Ed. 1108. In Roebling Employees Ass'n, Inc.,

v. National Labor Relations Board, supra, 120 F.2d at pages 294-296, we had occasion to consider the cases last above cited in relation similar to the present. What was said there need not now be repeated but it is equally applicable here. In like manner, the use of detectives as labor spies to report on "outside" union activities of employees justified an inference of company support of existing "inside" unions and interference with the employees' freedom of choice. National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 251, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, and National Labor Relations Board v. Link-Belt Co., supra, 311 U.S. at page 588, 61 S.Ct. 358, 85 L.Ed. 368. This is so even in the absence of a showing that specific use was made of the information so obtained or. that the employees were aware that they were being or had been spied upon. Bethlehem Steel Co. v. National Labor Relations Board, App.D.C., 120 F.2d 641, 647.

■ The evidence in the case, both direct and circumstantial, sufficiently supports the Board's findings material to the charges of the complaint. Being thus conclusive (Sec. 10(e)), the findings, in turn, justify the Board's conclusions that the respondent was guilty of violating Sec. 8(1), (2), (3), and, (4) of the Act. And the consequent order, except for portions to be amended as hereinafter directed, is appropriate to the conclusions. It therefore constitutes a valid exercise of the Board's power.

■ We can find no merit in the respondent's further contentions that the Board erred in concluding that Lodge 1741 of the Amalgamated Association, etc., and S. W. O. C. are labor organizations within the meaning of Sec. 2(5) of the Act, or that the Board's order is based on matter not appearing of record, or that the injunction in paragraph 1(g) of the order is too broad. The case of National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930, upon which the respondent relies is distinguishable from the present case. In the Publishing Company case the employer's unfair labor practice was the refusal to bargain with a particular designated employee representative, and no more. Here, the employer's offenses against the Act, in complete denial of the employees' rights under Sec. 7, ran the gamut of unfair labor practices proscribed by the Act. In any case, the scope of the injunction is to be measured by the character and extent of the employer's past conduct toward employee organization and the right to bargain collectively. In the Publishing Company case, supra, the Supreme Court plainly indicated, 312 U.S. at page 436, 61 S.Ct. at page 700, 85 L.Ed. 930, that the injunction may be sufficiently broad so as to prevent violations of the Act "the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed by the employer in the past." Nor is the question of free speech which the respondent urges involved here. No one is restrained by the Board's order from saying anything. One's due accountability for the effect of his expressions is not a limitation upon his right to speak freely. See National Labor Relations Board v. Virginia Electric & Power Co., 62 S.Ct. 344, 86 L.Ed. ——, decided December 22, 1941; also National Labor Relations Board v. New Era Die Co., 3 Cir., 118 F.2d 500, 505.

Any apprehension that the order may be construed as embracing the respondent's labor relations with its employees at plants or divisions other than at Eddystone is groundless. The findings confirm that "The Eddystone plant of the respondent [is] the only plant with which we are here concerned, * * *" and the order by its express terms applies to "The Baldwin Locomotive Works, Eddystone, Pennsylvania," etc.

■ The respondent now contends that the back pay orders include losses wilfully incurred by the employees. No such suggestion was advanced before the Board. It therefore may not be raised here in the absence of "extraordinary circumstances" sufficient to excuse its not having been raised timely. Sec. 10(e).

Except for the form of the order, we deem the other matters argued by the respondent to be so incidental or so relatively minor as not to call for discussion.

■ Paragraph 2(c) of the order provides that the respondent shall post the customary notices of intention to comply with specified provisions of the order. The Board consents to a modification thereof so as to require that the notices state that "the respondent will not engage in the conduct from which it is ordered

to cease and desist" etc., rather than that it "will cease and desist in the manner set forth" etc. This is done to relieve the respondent of a possible implied admission of guilt of the unfair labor practices found by the Board and is in conformity with the Board's present practice in such regard. Paragraph 2(c) of the order also requires that the notices shall contain a statement "that the respondent's employees are free to become or remain members of Lodge 1741 of the Amalgamated Association of Iron, Steel, and Tin Workers of North America and Steel Workers Organizing Committee", etc. The respondent argues that such a statement implies a limitation in respect of the employees' choice of union affiliation. The Board answers that the direction is appropriate as the Amalgamated and the S. W. O. C were the organizations against which the respondent's opposition to employee membership was exerted. While that does furnish a reason why the employer should make plain in the notices that the employees are free to become or remain members of Amalgamated or S. W. O. C., it does not justify a wording which either may imply or be taken to imply that the employees' choice of union membership is limited to the Amalgamated or the S. W. O. C. The plainly indicated intent as well as the spirit of the National Labor Relations Act is the complete freedom of employees in their choice of a representative for collective bargaining. Good faith in the effectuation of that intent and spirit requires that an employee's freedom to join any union he may choose be made clear and not be left to inference. Board orders have been modified accordingly. Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, supra, at page 661 of 112 F.2d; Roebling Employees Ass'n, Inc., v. National Labor Relations Board, supra, 120 F.2d at page 296. Paragraph 2(c) of the Board's order will therefore be modified so as to be and read as follows:

"2. * * *

"(c) Immediately post notices to its employees in conspicuous places throughout its plant and maintain such notices for a period of at least sixty (60) consecutive days from the date of posting, stating that the respondent will not engage in the conduct from which it is ordered to cease and desist in paragraphs 1(a) to 1(g) of this Order, both inclusive, and that it will take the affirmative action set forth in paragraphs 2(a) and (b) of this Order; and that the respondent's employees are free to become or remain members of Lodge 1741 of the Amalgamated Association of Iron, Steel, and Tin Workers of North America and Steel Workers Organizing Committee, or to organize or join any union they choose, whether or not it is affiliated with a national union, and that the respondent will not discriminate against any employee because of membership in these or any such organizations;"

■ Paragraph 2(b) of the order, wherein reparation is awarded to five named employees, will be modified so as to eliminate therefrom the direction to deduct from the amount of back pay, otherwise due the employees, money received by them for work performed on work-relief projects and to pay over the amount so deducted to the government or governments which supplied the funds for such work-relief projects. Republic Steel Corporation v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6; National Labor Relations Board v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874, 888, certiorari denied 313 U.S. 595, 61 S.Ct. 1119, 85 L. Ed. 1549; National Labor Relations Board v. New Era Die Co., supra, 118 F.2d at page 506.

As herein modified, the order will be enforced.

CLARK, Circuit Judge (concurring and dissenting).

I agree with my learned colleagues that the respondent has failed to make its point about the trial examiner and about not being chargeable with unfair labor practices while in reorganization. As the preparation of this opinion has required me to give some attention to the record, I might even agree with them that the union disestablished by the Labor Board was most decidedly company dominated. However, inasmuch as it is my view that this Court should remand the case before passing upon that issue, I am filing this opinion. As I approach the question of the trial examiner's bias from a somewhat different point of view, I am including discussion of that matter also.

The majority opinion sets forth in footnote 10 the form respondent's counsel employed from the very beginning of the six-

teen thousand page record.[1] He only varied it to introduce rather irritating elaborations. The fact is that a departure from the judicial, shall we say norm or shall we say ideal, does not seem to be a matter of due process at all. Because of the rigidity which Federalism imposes on constitutional law and because draftsmen speak before and not after the event, the Fifth Amendment is not applicable. The early English common law was confused by Sir William Blackstone.[2] He misinterpreted a remark of Lord Coke's and expounded the view that the judicial office should be held in such high esteem that its individual holders were immune to disputable disqualification.[3] So bias,[4] a motivation outside of argument, and prejudice,[5] a motivation without argument, require the intangible proof of words, conduct or even attitude, whereas interest, relationship or advocacy in the cause are external facts automatically demonstrable. So unless the source of pollution is patent, filtration through minds worthy of the bench was presumed.[6]

We can quite understand an unwillingness to acknowledge that justice dispensed by biased and prejudiced judges is due process. It obviously is not if one may speak currently.[7] Some of the inferior Federal

---

[1] Respondent's Appendix, Vol. 1, p. 338.

[2] 3 Blackstone's Comm. p. 361.

[3] The Disqualification of Judges, 20 Columbia Law Review 594.

[4] "How easy the coach capsizes on the side to which it leans", Erasmus.

[5] "You shall not be my judge, for it is you
 Have Blown this coal betwixt my lord and me
 Which God's dew quench."
Shakespeare, Henry the Eighth, Act 2, Scene 4.

[6] " * * * With logical consistency the English courts hold that a judge is rendered incompetent upon a showing of a real possibility of bias. Accordingly it has been held that personal animosity between judge and party or membership of the judge in a class which will be interested in the outcome is sufficient for recusation. There has thus been a wholesome recognition that human frailty may not be overcome by trained habits of impartiality, that the human limitations of the presiding judge may result in the deprivation of a just hearing, and that the stimulation of public confidence in the integrity of the judiciary demands that the judge be not only actually fair minded, but above all suspicion to the contrary. In the United States, however, the courts have drawn an irrational distinction. While it is commonly held that interest is a sufficient ground for disqualification, prejudice, is not. * * *

"A justification often advanced for the aged distinction between bias and interest is that the English rule affords too great an opportunity for unmerited attacks on judges and needless delay of trial. While it is true that a charge of bias not founded on some established relationship may easily be fabricated; resulting prosecutions for perjury would seem to furnish an efficient check. Furthermore, it is hardly an adequate reason to reject a desirable rule merely because there may be an abuse. A further justification suggested is that since the judge passes only on the law a party's rights may be adequately protected by appeal. But it is common knowledge that a biased judge may prejudice a party's cause without this appearing on the record." Disqualification of a Judge on the Ground of Bias, 41 Harvard Law Review 78, 79, 81, 82.

The principle of judicial recusation stems from civil law and most civil law countries make disqualification easy. French Code of Civil Procedure, tit. 21, art. 378; German Code of Civil Procedure §§ 41, 42; Spanish countries, Eseriche, Diccionario razonado de Legislacion y Jurisprudencia, pp. 1489, 1940; cf. Louisiana Code of Practice, p. 268 (1914).

[7] " * * * While present judicial ethics would serve to make recusation desirable because of bias per se, it has not been easy to overcome the sanctity with which the judicial system and its officers are surrounded and the practical difficulties of discovering when judicial bias exists or deciding what degree of prejudice is essential to disqualification. In recent years, however, many legislatures have made bias or prejudice per se cause for disqualification, or have found it to be part of their constitutional or common law. * * *

"Our judicial system has now achieved a sophistication which should permit realistic approach to the question of disqualification of judges. Extreme solutions of change at the will of the suitor, or only in the presence of a narrowly defined substantial interest, have only a possible administrative simplicity to offer to counteract their inadequacy in providing a fair result in the particular case. Of the two mediate solutions which have been proposed, the 'reasonable apprehension' doctrine appears superior. Its subjectivity rightly recognizes that honest belief in the presence of bias can be al-

Courts[8] have talked rather glibly and without much analysis of partiality and process.[9] The subject has only twice been considered in the Supreme Court and in both instances by way of dictum.[10] In the earlier case the Court permitted a conviction for murder in a State Court to stand although *only* the "preponderance" of the evidence indicated the sanity of one of the jurors. In doing so, Mr. Justice Lurton observed that "due process implies a tribunal both impartial and mentally competent."[11] Any experienced trial judge may smile at the last naive tribute to some of the jurors a too complacent method of selection[12] inflicts on the courts. Many professors of law write as if the same subject in its judicial connotation would afford them some amusement. The dictum in the later case makes it plain that the earlier learned justice must have been speaking colloquially rather than by the book. Chief Justice Taft says:

"All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest would seem generally to be matters merely of legislative discretion. Wheeling v. Black, 25 W.Va. 266, 270. But it certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." Tumey v. Ohio, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749, 50 A.L.R. 1243.[13]

It is clear, then, that counsel's coupling of the objection for bias and prejudice with the constitutional shibboleth is inaccurate. Is that inaccuracy a matter of substance or of form? The writer thinks it substantial in this sense. It is true that judicial impropriety of any kind may constitute reversible error.[14] In that aspect the courts are not limited to the standards of 1789.[15] It is also true that we sit as an appellate court in Labor Board cases.[16] If accordingly the Court finds bias and prejudice, it can send the litigation back for correction and retrial thereafter. Whether it will do so may be another matter. Its action may depend on such questions as timeliness and waiver for failure to act in good season. Those considerations might very well take on additional complications if the Court must be concerned with the loss of constitutional rights.

It is not necessary to discuss here the shades and niceties of the ascription to administrative bodies of judicial functions. That subject is a complicated one.[17] It is conceded here that the Labor Board has sufficient of that ascription to require impartiality in its members. Our Court has

---

most as serious a handicap to judicial efficiency, if not justice itself, as factual prejudice." Disqualification of Judges Because of Bias and Prejudice, 51 Yale Law Journal 169, 175.

[8] Bethlehem Steel Co. v. N.L.R.B., App. D.C., 120 F.2d 641; N.L.R.B. v. Ford Motor Co., 6 Cir., 114 F.2d 905.

[9] Some state constitutions have express provisions, King v. Grace, 293 Mass. 244, 200 N.E. 346.

[10] Jordan v. Massachusetts, 225 U.S. 167, 32 S.Ct. 651, 56 L.Ed. 1038; Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749, 50 A.L.R. 1243.

[11] Jordan v. Massachusetts, 225 U.S. 167, 176, 32 S.Ct. 651, 652, 56 L.Ed. 1038.

[12] Cf. the unpaid commissioner, 28 U.S. C.A. § 412.

[13] Referred to in footnote 9 of the majority opinion.

[14] 30 Amer.Juris.Judges § 97.

[15] Powell v. Alabama, 287 U.S. 45, 65, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527.

[16] 29 U.S.C.A. § 160.

[17] Symposium on Administrative Law, 47 Yale Law Journal 515-674; Cushman, The Independent Regulatory Commissions, Chapter 6; The Constitutional Status of the Independent Regulatory Commissions; Gellhorn, Federal Administrative Proceedings, Chapter 1, The Administrative Agency—A Threat to Democracy?; Frankfurter, The Task of Administrative Law, 75 University Pennsylvania Law Review 614, 615; Frankfurter, Foreword to a Discussion of Current Developments in Administrative Law, 47 Yale Law Journal 515, 517; Feller, Prospectus for the Further Study of Federal Administrative Law, 47 Yale Law Journal 647, 663; Cooper, Administrative Justice and the Role of Discretion, 47 Yale Law Journal 577, 578; Feller, Administrative Law Investigation Comes of Age, 41 Columbia Law Review 588, 600-602; Landis, The Administrative Process 3; Jaffe, Invective and Investigation in Administrative Law, 52 Harvard Law Review 1201, 1208, 1211-1212; Jennings, Courts and Administrative Law—The Experience of English Housing Legislation, 49 Harvard Law Review 429; Carr, Concerning English Administrative Law 11-116.

already so decided.[18] Another Board has insisted on it for itself. [19] Nor has the requirement ever been thought irrelevant to examiners.[20] In fact, there seem to have been an unfortunate number of instances where bias and prejudice has been charged to Labor Board Examiners.[21] We find them in both the reports of the Board[22] and of the reviewing authorities.[23] The frequency of the charge here contrasts unfavorably with the few reported cases on the subject in the analogous field of court appointed subordinates. The appropriate section of the Digest[24] reveals only nine[25] cases in two hundred years as against six[26] in seven years.

The Labor Board Examiner seems somewhat of a legal hermaphrodite. Judicial, like other human bodies, suffer from limitations of time and space. To overcome them they early resorted to what might be termed the tentacle system. Its earliest emanation appears to have eventuated from the method of taking testimony in Chancery. As the judge, unlike the jury, was supposed to be able to read, the advantages of observation of demeanor were felt outweighed by the opportunity ·for quiet study of the written page. So evidence was by interrogatory and their answering was supervised by Examiners either standing or appointed pro hac vice.[27] At first the task was one of collection and collation, and the subordinate court officer had only the power and discretion necessary to the accomplishment of that more or less ministerial task. That it was not and could not be quite colorless is disclosed in the ancient rules for the guidance of Examiners.[28]

Once having intrusted discretion it was easy to expand its limits and make the deputization more actual. So we find the

---

[18] Berkshire Employees Ass'n, etc., v. N.L.R.B., 3 Cir., 121 F.2d 235.

[19] In the Matter of Segal and Smith, 5 F.C.C. 1; cf. Montana Power Co. v. Public Service .Commission, D.C., 12 F. Supp. 946.

[20] " * * * After that decision was rendered by this court, the defendants moved that the rule to the master be discharged and a new master appointed. In substance, the grounds alleged in that motion were that the master had prejudged this case because of his decision in the other case, and was biased and could not give the defendants that impartial hearing to which they are entitled. Affidavits and counter affidavits were filed. The motion was denied after hearing and consideration, and the defendants appealed. The discharge of one master after hearings have begun and the appointment of another is unusual. It ought not to be done except for compelling reasons. The master in the case at bar was exceptionally equipped by long experience in high judicial position. It is the right of every citizen, secured by constitutional mandate, to be tried by judges as 'free, impartial and independent as the lot of humanity will admit.' No one ought ever to be appointed master in an equity suit whose character is not unblemished and above reproach. His mind ought always to be open to the truth and susceptible to every right influence flowing from the evidence."

Dittemore v. Dickey, 249 Mass. 95, 144 N.E. 57, 58.

[21] Gellhorn and Linfield, Politics and Labor Relations: An Appraisal of Criticisms of NLRB Procedure, 39 Columbia Law Review 339, 356, 387.

[22] Union Die Casting Co. Ltd., 7 N.L. R.B. 846; Express Publishing Co., 8 N. L.R.B. 162; Midland Steel Products Co., 11 N.L.R.B. 1214; Johns-Manville Products Corp., 17 N.L.R.B. 895; Air Associates, Inc., 20 N.L.R.B. 356; Indiana & Michigan Electric Co., 20 N.L.R.B. 989; Henry Glass & Co., 21 N.L.R.B. 727; Ford Motor Co., 23 N.L.R.B. 342.

[23] Montgomery Ward & Co. v. N.L.R. B., 8 Cir., 103 F.2d 147; Cupples Co. v. N.L.R.B., 8 Cir., 106 F.2d 100; Inland Steel Co. v. N.L.R.B., 7 Cir., 109 F.2d 9; N.L.R.B. v. Ford Motor Co., 6 Cir., 114 F.2d 905; N.L.R.B. v. Washington Dehydrated Food Co., 9 Cir., 118 F.2d 980; Bethlehem Steel Co. v. N.L.R.B., App.D. C., 120 F.2d 641.

[24] West Digest System, Equity ⬥—393.

[25] In re Volland, 7 Cir., 69 F.2d 475; Story v. De Armond, 179 Ill. 510, 53 N. E. 990; Strong v. Strong, 9 Cush., Mass., 560; Vette v. Geist, 155 Mo. 27, 55 S. W. 871; Teter v. Moore, 80 W.Va. 443, 93 S.E. 342; Brewer v. Asher, 8 Okl. 231, 56 P. 714; New River Grocery Co. v. Neely, 106 W.Va. 96, 144 S.E. 874; Dittemore v. Dickey, 249 Mass. 95, 144 N.E. 57; Anonymous, 1804, 9 Vesey Jr. 341.

[26] See footnote 23 of this opinion.

[27] 1 Daniell's Chancery Pleading and Practice (5th ed.) Chap. 22; cf. as to the American practice, Stone, The Record on Appeal in Civil Cases, 23 Virginia Law Review 766; Griswold and Mitchell, The Narrative Record in Federal Equity Appeals, 42 Harvard Law Review 483.

[28] "The Examiner is not strictly bound to the letter of the interrogatories, but ought to explain every matter or thing which ariseth necessarily thereupon; and

ancient office of Master in Chancery.[29] His duty was not only to collect and collate but also to report and recommend.[30] With the growth of the centralized and centrally placed quasi-judicial body, the time-space factor compelled an increased resort to both kinds of assistant. So nearly everyone of the Federal Boards employs some kind of field hearer.[31] The Labor Board Examiner at first blush seems to fall into the more important and elevated category. He may be called on, as here,[32] to file an intermediate report with recommendations. As he need not be required to do so[33] and as even his unexcepted-to recommendations are not always treated with much respect by the parent board, his position is, as the writer has said, somewhat hybrid.[34] But whether more strictly an examiner or, a fortiori, a master, he has not the automatic character of the slot machine or the stenographer[35] and so is subject to disqualification for failure to be impartial.

The law exists for the correction and not for the commission of errors. As a corollary the mistaken course must be halted as soon as perceived. The respondent perceived an alleged bias here even before it occurred.[36] It complained a multitude of times, practically whenever its counsel paused for breath. Yet it made no move to correct the error. That move was both

---

forasmuch as the witness, by his oath, which is so sacred, calleth Almighty God (who is truth itself, and cannot be deceived, and hath knowledge of the secrets of the heart) to witness that which he shall depose, it is the duty of the Examiner gravely, temperately, and leisurely to take the depositions of witnesses, without any menace, disturbance, or interruption of them in hinderance of the truth." Lord Clarendon's Orders, 1 Daniell's Chancery Pleading and Practice (5th ed.) 888.

29 2 Daniell's Chancery Pleading and Practice (5th ed.) Chap. 29.

30 19 Amer.Juris.Equity § 365. The practice has been abused:

"* * * In some jurisdictions the courts have come to treat most cases which are important and involved as 'exceptional', and, over the protest of the litigants, have referred these to special masters 'to take and hear the evidence offered by the respective parties, and to make their conclusions as to the facts and recommend the judgment to be rendered thereon.'" Lane, Twenty Years Under the Federal Equity Rules, 46 Harvard Law Review 638, 642.

31 The Monographs of The Attorney General's Committee on Administrative Procedure (1940) disclose that this is a common practice at the following Boards among others: Department of Labor, Division of Public Contracts, No. 1, p. 12; Federal Communications Commission, No. 3, p. 26; United States Maritime Commission, No. 4, p. 14; Federal Alcohol Administration, No. 5, p. 26; Federal Trade Commission, No. 6, p. 26; Department of Agriculture, Administration of Grain Standards Act, No. 7, p. 23; Administration of Packers and Stockyards Act, No. 11, p. 41; Railroad Retirement Board, No. 8, p. 76; Federal Reserve System, No. 9, p. 62; Fair Labor Standards Act, Wages and Hours Division, No. 12, p. 51; Post Office Department, Fraud Orders, No. 13, p. 52; Federal Deposit Insurance Corp., No. 14, p. 78; War Department, Regulation of Bridge Construction etc. No. 15, p. 19; Social Security Board No. 16, p. 37; National Labor Relations Board, No. 18, p. 34; Civil Aeronautics Authority, No. 19, p. 28; Department of Interior, Grazing Service, No. 20, p. 33; General Land Office, No. 20, p. 97; Office of Indian Affairs, No. 20, p. 119; Bituminous Coal Division, No. 23, p. 40; Board of Tax Appeals, No. 22, p. 185; Interstate Commerce Commission, No. 24, p. 29; Federal Power Commission, No. 25, p. 17; Securities and Exchange Commission, No. 26, p. 117.

32 Respondent's Appendix, Vol. 2, p. 1710.

33 Wolf, Administrative Procedure Before the National Labor Relations Board, 5 University of Chicago Law Review 358, 373.

34 "If the Commission is free wholly to disregard the trial examiner's report, it may be questioned whether the report adequately serves one of its most important supposed functions, that of notifying the parties of the issues involved. The issues discussed in such a report may not be the issues which move the Commission. Exceptions and argument directed to a report which has no binding quality may be futile." Lane, Address in Symposium on Administrative Law, 9 American Law School Review 154, 160.

35 It might be said that even a stenographer might display more or less skill according to his prejudice; cf. United States v. Morgan, 313 U.S. 409, 420, 421, 61 S.Ct. 999, 85 L.Ed. 1429.

36 The respondent's criticism appeared in its answer. See footnote 1 of this opinion.

simple and patient. The examiner, like the master, is the creature of his creator. The Board and the Court. giveth and so can take away. It should have been asked to do so. In some instances it has been.[37] We are surprised that in the cases where the point has arisen[38] the analogy between the present day examiner and his ancient proto-type, the Master in Chancery, has not been thought of. As long ago as 1804,[39] Lord Eldon acceded to a motion that a reference should be removed to the office of another master.[40] That has been the universal practice since.[41]

A judicial body which appoints an assistant clothes him with its own qualities and if that clothing does not fit a new wearer should be instantly secured. As this can be done, it must be done. Otherwise we have the acquiescence in error of which the writer has spoken. I can scarcely believe that the difference between a re-movable examiner and a fixed judge[42] is not sufficiently plain both to the litigants engaged below and the court engaged above. The writer prescribes then what he believes to be the sound rule. A litigant before a Labor Board Examiner must demand his replacement as soon as it deems his conduct improper or else he must forever hold his peace.[43]

To say such a complaint is of no avail impugns the integrity of the Board first and of the Circuit Court of Appeals second. To say it will "further antagonize" the Examiner is surely a bootstrap argument. Any showing of such further antagonism can in its turn be objected to and so on until the litigant finally comes to the courts with no loss other than having been compelled to the exertion of helping judicial bodies to correct error when it occurs. Yet these are the arguments adduced by the United States judges holding contra our Court's view. [44]

---

37 See Union Die Casting Co., 7 N.L.R.B. 846; Express Publishing Co., 8 N.L.R.B. 162.

38 Bethlehem Steel Co. v. N.L.R.B., App.D.C., 120 F.2d 641.

39 Anonymous, 1804, 9 Vesey Jr. 341.

40 " * * *the counsel alleged that upon going before the master to whom the cause stood referred who was of a very advanced age, and extremely infirm, he found him in such a state, that it was not proper to go into the business before him." Anonymous, 1804, 9 Vesey Jr. 341.

41 " * * .* we could not consider the same, as the record shows that the objection to the referee on account of bias and prejudice was not presented to the court, but to the referee himself. * * * The referee had no jurisdiction to pass upon any such question. He had no authority to determine his own qualifications as referee. Those questions were exclusively for the court that appointed him. The only authority vested in the referee was to hear and report upon the issue or issues in the cause referred. If the plaintiff in error had desired to raise the question of the qualifications of the referee, it should have presented the same to the court by a motion to discharge the referee, or other appropriate motion. Brewer v. Asher, 8 Okl. 231, 56 P. 714, 715.

In re Volland, 7 Cir., 69 F.2d 475; Story v. De Armond, 179 Ill. 510, 53 N.E. 990; Vette v. Geist, 155 Mo. 27, 55 S.W. 871; Teter v. Moore, 80 W.Va. 443, 93 S.E. 342; New River Grocery Co. v. Neely, 106 W.Va. 96, 144 S.E. 874; Anonymous, 1804, 9 Vesey Jr. 341.

42 In some jurisdictions a proceeding in prohibition may be made to restrain even a judge from participating further in an action. Hall v. Superior Court, 198 Cal. 373, 245 P. 814; Conkling v. Crosby, 29 Ariz. 60, 239 P. 506; State ex rel. McAllister v. Slate, 278 Mo. 570, 214 S.W. 85, 8 A.L.R. 1226; Forest Coal Co. v. Doolittle, 54 W.Va. 210, 46 S.E. 238; People ex rel. Burke v. District Court, 60 Colo. 1, 152 P. 149; or a writ of mandamus transferring the jurisdiction to another judge may be arranged, State ex rel. Douglas v. Superior Ct., 121 Wash. 611, 209 P. 1097. But for the Federal rule contra, cf. Minnesota & Ontario Paper Co. v. Molyneaux, 8 Cir., 70 F.2d 545.

43 I quite agree with the author of the article on judicial bias and prejudice above cited. He said:

" * * * Any well functioning system of disqualification should, of course, require immediate challenge to the eligibility of the judge as soon as the facts leading to apprehension of bias become known; strict insistence upon waiver in the absence of such protest is necessary to prevent last minute 'discovery' of bias by losing parties 'combing' the record for grounds for reversal upon appeal. It is to be hoped, however, that an ever increasing number of jurisdictions will adopt this flexible standard for judging the unceasing claims of litigants that they have been denied justice." Disqualification of Judges Because of Bias and Prejudice, 51 Yale Law Journal 169, 175.

44 Inland Steel Co. v. N.L.R.B., 7 Cir., 109 F.2d 9.

The writer has stressed the chronological point for this reason. Counsel for the Board do not seem to be sufficiently interested in orderly procedure to trouble about it. So I feel obliged to caution those practicing before Labor Board Examiners that they cannot speculate on an unfavorable decision by the insurance of a charge of bias. Such a course taints the charge itself with insincerity. How true that taint is·in the principal case is painfully apparent. Respondent finds the lack of "dueness" on the part of the trial Examiner in the following asserted conduct: his refusal to permit the statement of the grounds for certain exceptions, his refusal to issue certain subpoenas, his refusal to permit certain questions, and finally his personal participation in the questioning of certain witnesses.

To begin with, respondent's counsel displays a complete misconception of the mean ing of a partial mind. Such a mind is one that is closed to justice because some factor dehors the record prevents it from functioning. If it does operate, the fact that counsel does not agree with that operation or even that no one agrees with that operation may indicate such matters as lack of education, legal or otherwise, lack of I.Q., lack of judicial temperament et cetera, but it does not spell lack of fairness. So the courts forbid any deduction of bias and prejudice from adverse rulings. [45] One might, although counsel here does not, suggest a possible exception, if the unfavorable rulings are frequent and stupid enough. I say possible, but not probable, exception because to make the inference logical would require a mental examination of the particular judicial officer.

The writer confesses to have never before seen the word "prevent" used to de- scribe such adverse rulings. Counsel seems much· addicted thereto and uses it many times. [46] It carries with it a flavor of physical force and seems intended to give us some impression of violence and an outrage upon trial decencies and amenities. The rose is no less redolent. The "prevention" of certain questions on cross-examination and of certain offers and questions on direct is not raised by the use of the word into anything more than an adverse ruling. Among the preventions listed is one for obtaining subpoenas (both ad testificandum and duces tecum) for the production of evidence on two certain issues. The respondent exhibits some confusion as to the exact nature of the process for compelling testimony. As is known its origin springs from the need to correct the "meddling and maintenance" theory that at first marked the transition from the early jury-neighbor trial to our modern system. [47] That correction had been made prior to the Constitution and so under the theory earlier discussed it would seem to have become part of due process. [48] In criminal cases the Constitution goes beyond the vague and general into the particulars. [49] In civil cases the statutory grant to courts is so universal that the question does not arise. Sometimes it has not been accorded to administrative boards. There has been some rather inconclusive discussion about this in relation to due process. [50] The National Labor Relations Act is quite specific. As the word used is "power", [51] the issuance is not automatic as it is with the United States Courts. [52] The Board can therefore impose qualifications. At the time of the principal case it had done so. [53] So had many of the other administrative agencies. [54] We are only concerned with their reasonableness.

[45] 30 Amer.Juris.Judges § 74; Ex parte American Steel Barrel Co., 230 U.S. 35, 33 S.Ct. 1007, 57 L.Ed. 1379; Walker v. United States, 9 Cir., 116 F.2d 458.

[46] Respondent's brief, pp. 9–26.

[47] 8 Wigmore on Evidence (3d ed.) § 2190.

[48] Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674, 90 A.L.R. 575.

[49] U.S.C.A.Constitution, Part 2, Amendment VI.

[50] Subpoenas and Due Process in Administrative Hearings, 53 Harvard Law Review 842; Gellhorn and Linfield, Politics and Labor Relations An Appraisal of Criticisms of NLRB Procedure, 39 Columbia Law Review 339, 377–385.

[51] 29 U.S.C.A. § 161.

[52] Federal Rules of Civil Procedure, Rules 45(a), 45(e) (1), 28 U.S.C.A. following section 723c; Holtzoff, New Federal Procedure and the Courts, p. 122. In respect to subpoenas duces tecum the issuance is ministerial but subject to motion to quash if unreasonable and oppressive. Rule 45(b), 28 U.S.C.A. following section 723c; 403-411 E. 65th St. Corp. v. Ford Motor Co., D.C., 27 F.Supp. 37; Folley Amusement H. Corp. v. Randforce A. Corp., D.C., 1 F.R.D. 496.

[53] Board's Rules and Regulations, Art. 2, sec. 21.

[54] Monographs of The Attorney General's Committee on Administrative Procedure (1940): Department of Labor, Division of Public Contracts, No. 1, p. 13; Federal Communications Commis-

The requirement of relevancy falls within that bracket. It is common as to all subpoenas duces tecum,[55] and as to witnesses from a distance.[56] To have the judicial officer pass on the evidence before the burden is imposed rather than afterwards saves everybody and is manifestly sensible.

The Board's subpoena rule involves more than the fairness of the requirement of relevancy. This because it is one-sided and the proscription applies to the respondent only. Its reasonableness has been supported[57] and questioned.[58] To do the latter in the constitutional sense would, the writer suggests, imply the holding that a litigant has some vested right in "preventing" his opponent from bothering people unnecessarily. In other words, if he has the privilege of bringing in all relevant evidence, or more accurately perhaps the right to reverse for not being granted such privilege, he can scarcely be injured by his opponents having wasted everyone's time and money by getting up to the barrier with stuff afterwards found to be just that. As a matter of fact, it is rather doubtful if evidence that is irrelevant and no worse offered by and admitted for your opponent is error without more.

For that reason the writer prefers the cases which hold that the refusal to issue subpoenas must have been affirmatively prejudicial.[59] That, of course, cannot exist if the evidence called for by them is irrelevant or inopportune. This is most plainly the case. The respondent suggests it wanted to show that the S.W.O.C.[60] is not a "self-organization".[61] The prefixal use of "self" occurs in numerous compounds and is grammatically correct.[62] The resulting term, however, must convey some meaning. This self-organization standing alone, does not do and so we must turn, therefore, to the guarantee of the National Labor Relations Act,[63] for interpretation. There it is used in the phrase "the right to self-organization",[64] which is a rather awkward way of saying "the right to organize themselves" and is fully met by any proof that the S.W.O.C. is composed of employees of the respondent who have formed any kind of association. This proof the trial examiner was expressly willing to receive and to issue subpoenas for the procurement of.[65] As a matter of fact, it was really unnecessary to resort to evidence at all. The examiner could not accept evidence from other cases and was wrong in saying he could.[66] Nevertheless, the modern and expanded doctrine of judicial notice might well have placed the S.W.O.C. in the category of notorious miscellaneous facts.[67]

The trial examiner felt himself constrained to follow what appears to be an exception to the rule of disqualification of judges. The cases held that the rule must yield to the demands of necessity. Accordingly they inflict a biased and prejudiced judge upon litigants on a theory similar to the one that "the mail must go through".[68] The majority of jurisdictions now of course provide by Constitution or statute for substitute judges.[69] The subject is therefore nearly always academic. Either adminis-

---

sion, No. 3, p. 24; United States Maritime Commission, No. 4, p. 9; Federal Alcohol Administration, No. 5, p. 21; Department of Commerce, Bureau of Marine Inspection and Navigation, No. 10, p. 28; Fair Labor Standards Act, Wages and Hours Division, No. 12, p. 70; Civil Aeronautics Authority, No. 19, p. 41; Department of Interior, Bituminous Coal Division, No. 23, p. 45; Interstate Commerce Commission, No. 24, p. 58; Federal Power Commission, No. 25, p. 83; Securities and Exchange Commission, No. 26, p. 215.

[55] 70 C.J. Witnesses § 40.

[56] 70 C.J. Witnesses § 25; 28 U.S.C.A. § 654; Benedict v. Seiberling, D.C., 17 F.2d 841, 845; Blackmer v. United States, 60 App.D.C. 141, 49 F.2d 523, 531.

[57] Right to Process for Witnesses Before Administrative Tribunals, 1 Bill of Rights Review 131; Gellhorn and Linfield, Politics and Labor Relations: An

Appraisal of Criticisms of NLRB Procedure, 39 Columbia Law Review 339.

[58] Inland Steel Co. v. N.L.R.B., 7 Cir., 109 F.2d 9.

[59] North Whittier Heights Citrus Ass'n v. N.L.R.B., 9 Cir., 109 F.2d 76; N.L.R.B. v. Ed. Friederich, Inc., 5 Cir., 116 F.2d 888.

[60] Steel Workers Organizing Committee.

[61] Respondent's Brief, p. 26.

[62] Self, 2 New Century Dictionary, p. 1654.

[63] 29 U.S.C.A. § 151.

[64] 29 U.S.C.A. § 157.

[65] Respondent's Appendix, Vol. 1, pp. 336, 337.

[66] He seems to have had some reversed idea of res inter alios acta in mind.

[67] 9 Wigmore on Evidence (3d ed.) § 2580.

[68] The cases are collected in 33 C.J. Judges, § 130 Necessity Obviating Rule.

[69] The cases are collected in 33 C.J.

trative boards are too recently created or their personnel is deemed to be too pure to have had their originating statute close this gap. The doctrine seems rather one of despair. I suggest it would be wiser to have no litigation than biased litigation. Who would be injured thereby is dependent on the numerical ratio of merit to bias. The sufferer has always the right to apply for executive or legislative redress either by way of pardon or by remedial legislation. [70] The vague, verbose and veiled manner in which the charges against the entire membership of the Labor Board are made leaves one in some doubt as to their good faith. However, there is no question about their assertion. I do not have to declare our adherence to the defeatism of the cases above referred to. A trial examiner appointed to collect and recommend might collect but he could hardly be expected to recommend the disqualification of the very authority that appointed him. He could therefore have properly refused the evidence on the ground that it should have been presented to the Board itself. This course we ordered in the case already twice cited. [71] The fact that he did not assign this reason would be no excuse for a subsequent failure to follow such a course. A judicial officer is under no obligation to give the correct reason for his action. If that were not so, judges might be in peril.

Respondent's two other criticisms of the examiner's conduct have even less merit. Its counsel's understanding of the function of the exception to a judicial ruling dates back to the Middle Ages. Because of that, he seemed to think that he should make them co-equal in number with the questions asked. Modern procedure recognizes that the exception is simply a matter of fairness to the person whose duty it is to rule. [72] He should and so in fairness must be informed that a particular ruling is not, in the opinion of a particular protagonist, sound. Professor Wigmore puts it thus:

"In modern practice, in the United States, where the proceedings are usually reported stenographically, the defeated counsel's announcement of an exception at the time of the ruling has become less important; his reliance upon the supposed error of the ruling can as well be indicated later at the time of a motion for a new trial. Moreover, the practice of some counsel in some regions of emitting perfunctorily at every ruling a snapping ejaculation 'Except!' has impaired needlessly the sobriety of the proceedings and the prestige of the judge. Hence, a modern movement is prevailing to *abolish the exception*, i. e., to abandon the requirement of announcing *at the time of* the unsatisfactory ruling the counsel's intention to treat it as an error for purposes of appeal. This relegates him to some later stage of the proceedings for specifying and saving his grounds of appeal." 1 Wigmore on Evidence, 3d Ed., § 20, p. 355. [73]

In the principal case it is more than understatement to say that the examiner was made thoroughly familiar with all of counsel's rather decided views. He acknowledged his perception thereof by the standard practice of the exception to a line of questioning.

This modernization and departure from the "game and umpire" conception of courts has progressed just as much in respect to participation in the trial by the judicial officer. [74] In England where the aforesaid theory never found much lodgment, any suggestion that a judge could be criticized for his efforts to bring out the truth has always been scorned. [75] Here, also, we may advantageously quote a summary by Professor Wigmore:

"One of the natural parts of the judicial function, in its orthodox and sound recognition, is the judge's power and duty to *put* to the *witnesses* such *additional questions* as seem to him desirable to elicit the truth more fully. This just exercise of his function was never doubted at common law; the

---

Judges, § 212 Disqualification or Inability of Regular Judge.

[70] Putnam, Recusation, 9 Cornell Law Quarterly 1, 9.

[71] Berkshire Employees Ass'n, etc., v. N.L.R.B., 3 Cir., 121 F.2d 235.

[72] Holtzoff, New Federal Procedure and the Courts, p. 131.

[73] See also, New York Commission on the Administration of Justice, 1934 Report (Legisl.Doc.1934, No. 50, p. 300).

[74] 3 Wigmore on Evidence (3d ed.) § 784.

[75] "Folly, my lords, has said that in examining the witnesses we put leading questions. The accusation is ridiculous; it is almost too absurd to deserve notice. In the first place, admitting the fact, can it be objected to a judge that he put leading questions? * * * But to say that the judge on the bench may not put what questions and in what form he pleases can only originate in that dullness and stupidity which is the curse of the age." Lord Ellenborough, 25 Hansard ParLDeb. 207.

judge could even call a new witness of his own motion, and could seek evidence to inform himself judicially; much more could he ask additional questions of a witness already called but imperfectly examined. Fortunately, in spite of the strong but subtle tendency to force the purely judicial function into the background, the tradition of the common law has never been lost; the right of the judge to interrogate as he thinks best has always been preserved in theory." 3 Wigmore on Evidence, 3d Ed., § 784, p. 152-153.

Counsel can therefore hardly expect us to adopt a numerical formula such as one question permitted to the examiner for every ten by him. The matter being imponderable, it is impossible to delimit the charge in anything more than general language. Acknowledgment of that fact is found in the terms of the appropriate Canon of Judicial Ethics. It reads:

"A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but he should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto." Canon 15, Interference in Conduct of Trial, 62 Reports of American Bar Association, p. 1127.

Even on such a formula the examiner in the case at bar seems to have stayed well within the proprieties. Respondent's counsel overlooks an essential aspect of this especial judicial officer. He and his Board are only quasi-judicial and have also, as has been asserted ad nauseam, a "prosecuting" function.[76] In that regard the examiner is charged with the duty of developing the case and so must be permitted a certain latitude. The matter is well put by Professor Davey:

"* * * While the examiner is essentially a judicial officer, he has this additional obligation of developing a complete record for the benefit of the board. If necessary, he may and does participate in questioning of witnesses, he may advise counsel as to lines of testimony they should develop, or he may himself introduce evidence. The examiner cannot take refuge in the fact that the board's attorney or employer's counsel have been negligent in their own duties.

"When a trial examiner questions witnesses, criticism has arisen that in so doing he is abandoning his proper judicial role. The writer emphatically disagrees with such a viewpoint. Again it must be stressed that examiners are presumed to be administrative experts as well as lawyers. The fact that they may participate in questioning witnesses, or even in the introduction of evidence, does not ipso facto destroy their judicial temperament and thus derogate from their primary function." Davey, Separation of Functions and the National Labor Relations Board, 7 University of Chicago Law Review 328, 338.

In conclusion as to the trial examiner I find, first, that the respondent chose to speculate on its faring before him rather than to ask for his removal the instant they had decided that he was a partial judge, and, second, that the latter decision has so slight basis in fact that the writer is astonished at its being made. Before I leave the discussion of the examiner's alleged bias and prejudice, I must refer to and reject a most curious argument advanced by the Board. It is asserted and not denied that respondent's counsel has made the same charge against three other Labor Board examiners and that in each instance the courts found it not justified. From this, the Board argues that it cannot be true here. Its counsel does not cite, as they could have, the only precedent that might support such a view. He might have used the analogy of the "previous acts of violence evidence" in self-defense cases.[77] Even if he had, the analogy would not hold. An individual may defend himself against hostile provocation. A judge, by definition, must not.

We come now to the matter in respect to which I am constrained to differ from my learned colleagues. The Board treated it with considerable casualness. The unsoundness of their position appears, I think, from its very statement. The Board maintains that judicial officers need not have any

[76] Gellhorn and Linfield, Politics and Labor Relations: An Appraisal of Criticisms of NLRB Procedure, 39 Columbia Law Review 339; Davey, Separation of Functions and the National Labor Relations Board, 7 University of Chicago Law Review 328.

[77] 1 and 2 Wigmore on Evidence (3d ed.) §§ 198, 248.

personal knowledge of the facts on which they base their decision. I am unwilling to assent to any such theory.[78] One reason for this approach on the part of the Labor Board's counsel may lie in his misunderstanding of our court's holding in an earlier case.[79] It is there said that the mental processes of the members of a judicial body must, if that is their wish, be kept from profanation by the public gaze. It is not said that the conduct of judicial officers cannot be proved in any fashion. Nor is it said that if that conduct is already known either by concession, by admission or other proof aliunde compulsion on the judges themselves, such knowledge must be disregarded. Misconduct of a juror is no longer held to come either within any privileged communication or parol evidence rule;[80] a fortiori that of a judge. Relevant evidence is often excluded because of some rule of public policy. It is none the less relevant and can therefore be used if the policy has disappeared because the evidence is already before the court.

In my view both conditions exist here. As I shall indicate later, the United States Supreme Court in the Morgan cases[81] insists that the quasi-judicial officer should "read and consider" the testimony offered before him.[82] The considering involves, of course, that inquiry into mental processes which we held privileged in judicial bodies of more than one member. A person may absorb the printed word through his eyes but its effect on his brain is known to him alone. So, reading on the part of judges is of factual significance only, just as much as is drunkenness on the part of jurors.[83] Furthermore, the quasi-judicial conduct here under scrutiny is not only conceded,

it has been frankly and fairly asserted on the best possible authority. As long ago as 1939 and one year before the revelations of the Smith Committee, the then Chairman of the National Labor Relations Board gave this candid description of their process of decision:

"* * * During the past three years the Board has issued some 1,200 decisions. At the present time there are several hundred cases pending before the Board for decision. The average record in each case is well over 1,000 pages. It can readily be seen from these figures that the Board members themselves cannot expect to read the records. In making its decision the Board, therefore, avails itself of assistants known as review attorneys who are under the direction of an Assistant General Counsel and a group of supervisors. The review attorneys analyze the evidence, inform the Board of the contentions of all parties and the testimony relating thereto, and, after decision by the Board, make initial drafts of the Board's findings and order." Madden, Chairman of the National Labor Relations Board, 51 Virginia State Bar Association Reports (1939), p. 414-415.

It has been several times adverted to and expatiated on since that time.[84] In fact, our learned colleagues say that they may well assume it.[85]

The writer does not wish to be unrealistic or stuffy about the problem. It troubled lawyers and judges for many years prior to the advent of the review-attorney device employed in the case at bar. The reading and mental absorption of vast quantities of written or printed material is time consuming and mind enervating, but it is at least less so than the pre-shorthand period's

---

[78] Cardozo, Judicial Proof.

[79] N.L.R.B. v. Botany Worsted Mills, Inc., 3 Cir., 106 F.2d 263, noted in Administrative Law—Due Process—Propriety of Interrogatories to Members of National Labor Relations Board, 17 New York University Law Quarterly Review 269; 28 Georgetown Law Journal 416; cf. N.L.R.B. v. Biles-Coleman Lumber Co., 9 Cir., 98 F.2d 16; Cupples Co. Manufacturers v. N.L.R.B., 8 Cir., 103 F.2d 953; Inland Steel Co. v. N.L.R.B., 7 Cir., 105 F.2d 246; N.L.R.B. v. Cherry Cotton Mills, 5 Cir., 98 F.2d 444.

[80] Lord Mansfield's self-stultification doctrine seems to have been abandoned. 8 Wigmore on Evidence (3d ed.) § 2352.

[81] Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288; Mor-

gan v. United States, 304 U.S. 1, 58 S. Ct. 773, 999, 82 L.Ed. 1129; United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211; United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429.

[82] Morgan v. U. S., 298 U.S. 468, 481, 56 S.Ct. 906, 80 L.Ed. 1288.

[83] 23 C.J.S., Criminal Law, § 1363, Jurors' Use of Intoxicating Liquors.

[84] Gellhorn and Linfield, Politics and Labor Relations: An Appraisal of Criticisms of NLRB Procedure, 39 Columbia Law Review 339; Davey, Separation of Functions and the National Labor Relations Board, 7 University of Chicago Law Review 328.

[85] Majority opinion, 128 F.2d 49.

necessity of remembering and chirographically noting and subsequently remembering. In the effort to ease the burden the task of compression was first entrusted to those responsible for the expansion. That was the genesis of the statutes and rules providing for the narrative form and for abstracts.[86] This solution rather fell afoul of the same litigious dispositions that had produced the original plethora. Counsel could not agree and the Court spent more time in adjudicating those differences than it would have in reading and reaching a decision on the unexpurgated record.[87]

The next attempt to spare if not judicial blushes, at least judicial efforts, is the one now under fire. The original record is read by experts hired for the purpose and the knowledge so acquired is imparted secondhand to the actual triers. An attempt has been made to gloss this process by describing it as the "sifting and analyzing" expressly approved by Mr. Chief Justice Hughes in the first Morgan case.[88] To say so is to indulge in a most patent pourparler. In plain language one man or men (the review attorneys) read and consider another or others (the members of the Labor Board) hear of the former's activities and decide thereupon. This is the so-called institutional or anonymous approach[89] as distinguished from the personal consideration traditional in courts of justice.

Must that tradition be preserved here? The writer thinks so. It is true that the institutional method has been followed in many of the administrative boards. The Attorney General's Monographs so indicate it.[90] We may someday have occasion to pass upon the practices of the others. In

---

[86] The Form and Scope of the Trial Record on Appeal, 36 Columbia Law Review 1133; Searls, Appeal and Error—Statement of Facts—Narrative or Question and Answer Form on Appeal, 7 Texas Law Review 423.

"The advantage of the narrative form of record over the certified question and answer transcript lies in the diminished bulk presented to the reviewing courts. It presents in a short prose resume that which was actually a dramatic dialogue before the court. If it be well drawn and condensed, it may present the main issues of contention and disagreement in a digested form to the reviewing court, but unless it be drawn by a master of sonnets it will necessarily be robbed of the innuendoes and shades of reasoning which were apparent on the stenographic transcript. * * * The determination of what to omit and what questions and answers to include as necessary, requires the greatest care, and the reduction of that which remains into a readable, adequate expression of the impressions and effect of the actual testimony in the lower court demands a mastery of prose such as few authors possess." Stone, The Record on Appeal in Civil Cases, 23 Virginia Law Review 766, 789, 790.

[87] Federal Rules of Civil Procedure and Proceedings of the American Bar Association Institute (1938), Rule 75, Record on Appeal to a Circuit Court of Appeals, p. 152.

"* * * Since the question and answer form most satisfactory fulfills the demands of judge, lawyer and litigant, the major problem is that of reducing the size of the record so as to lighten the burden on the judge. * * * Additional aids must come through auxiliary

agencies such as the more extensive use of law secretaries, and more careful delimitation of the right and scope of review." The Form and Scope of the Trial Record on Appeal, 36 Columbia Law Review 1133, 1140–1141.

[88] Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 80 L.Ed. 1288.

[89] "In truth, our legal system contains two traditions—the one, the court tradition of personal consideration of controversies by the judge, the other the departmental tradition of institutional consideration by a corps of officers under the general supervision of the agency head. In the court tradition the guarantee against error is chiefly the training and independent status of the judge, with a secondary guarantee in the process of appeal. In the departmental tradition, the guarantee against error is a series of automatic internal checks. In the ordinary case in an agency the decision is the product of the cooperative effort of a number of officers with the agency head (the process, indeed, sometimes being carried to excess). There is thus a constant process of checking and rechecking. Instead of relying upon the ability and integrity of a single judge, we rely upon the cooperative and cumulative efforts of a number of specialized officers." Feller, Administrative Law Investigation Comes of Age, 41 Columbia Law Review 589, 601.

[90] Monographs of The Attorney General's Committee on Administrative Procedure (1940): Department of Labor, Division of Public Contracts, No. 1, p. 20, 21; Federal Communications Commission, No. 3, p. 26; Department of Commerce, Bureau of Marine Inspection and Navigation, No. 10, p. 16; Federal

many instances the particular agency is undoubtedly purely administrative,[91] and so the group method cannot be objectionable.[92] As we have noted, the opposite is true here. The subject has been skirted twice. One Circuit Court of Appeals[93] held it could not interfere with some nonreading state appellate judges under the due process clause of the Fourteenth Amendment. There we would seem to have the same question of ancient history we have already spoken of.[94] The early judges, as we have said, enjoyed whatever compensation goes with freedom from too much mechanical improvement. The Supreme Court in the Morgan cases insisted on reading and considering. They qualified that insistence, however by the addition of "sifting and analyzing". As they did not go on and explain these latter terms, we must now determine for ourselves the extent of the qualification.

Those who have written on the subject are not in agreement. Some take the traditional and so conservative side. Dean Pound writing in the American Bar Association Journal says:

"It is fundamental that one who decides controversies and exercises what are substantially judicial functions should know the record thoroughly. If he is to decide on the basis of an abstract, it should be, as in the courts, one agreed on by the parties or settled after hearing both as to what it should contain—an abstract settled before argument and available to the parties at the argument so that those who argue and those who decide have the same material before them. He should not decide on an abstract made after argument by a subordinate, very likely in conference with the prosecuting advocate. The general attitude of too

many administrative agencies, however, is illustrated by the objection of the National Labor Relations Board to a provision recommended by the minority intended to emphasize the responsibility of the individual officer." Pound, For the "Minority Report", 27 American Bar Association Journal 664, 669.

To the same effect we find the Attorney General's Committee saying:

"But these assistants should be aides and not substitutes. The heads of the agency should do personally what the heads purport to do. We have already recommended that the work of personnel selection and management, the work of investigation, informal adjustment or decision, and the issuance of complaints in the generality of cases be vested in responsible officers. We here recommend similar relief so far as the hearing and initial decision of cases is concerned and have outlined the restricted nature of the review which should be given those decisions. But that review should be given by the officials charged with the responsibility for it, and the review so given should include a personal mastery of at least the portions of the records embraced within the exceptions.

"In agencies headed by a board, commission, or authority, further division of labor may be necessary to provide the time for individual attention by the agency heads. The members may find it necessary to sit in divisions, as do the Interstate Commerce Commission and the Board of Tax Appeals, with the full board reviewing decisions only in cases of exceptional importance or upon petition. It may be necessary to increase boards of three members to five, in order to make this possible.

---

Deposit Insurance Corporation, No. 14, p. 36; Civil Aeronautic Authority, No. 19, p. 39; Department of Interior, Grazing Service, No. 20, p. 37; Interstate Commerce Commission, No. 24, p. 32.

[91] For instance, Department of Commerce, Bureau of Marine Inspection, and Navigation.

[92] "*Executive* officers may rely on the assistance of others. Even where the duty 'to hear' in the first instance is imposed upon the head of a department, the evidence may be heard by others. And the conclusion will none the less be that of the head of the department, provided he adopts it as his own. * * * When we are dealing with appeals, there is no duty to examine personally a record on review. An *executive* officer, in re-

viewing a record on appeal, may avail himself of expert assistants in summarizing the testimony or the law and make their conclusions on the facts or the result of their research on the law his own." United States v. Standard Oil Co. of California, D.C., 20 F.Supp. 427, 448, 449. (Italics ours.)

[93] Owens v. Battenfield, 8 Cir., 33 F.2d 753, noted in Constitutional Law—Due Process—Failure of Appellate Justices to Read Record, 39 Yale Law Journal 278; Constitutional Law—Due Process of Law: Civil Remedies—Failure of Judges of Appellate Court to Read Evidence in Record, 43 Harvard Law Review 493.

[94] See this opinion, 128 F.2d at page 52.

64

"In single headed departments and agencies, like the Post Office and the Departments of Commerce and Agriculture, the Committee recommends that all pretense of consideration of each case by the agency head be abandoned and that there be created either boards of review, as in immigration procedure, or chief deciding officers who shall exercise the final power of decision. But if the agency head in these departments does review a case, he must assume the burden of personal decisions." Final Report of the Attorney General's Committee on Administrative Procedure, 1941, pp. 52, 53.[95]

Others vindicate the radical and institutional procedure. Professor Handler says:

"Under the Morgan cases, it is patent that although subordinates may be used to assist in the reaching of a decision, the function of actually deciding may not be delegated to them. However, the degree to which the Board must participate in the formulation of the final orders cannot be charted with minute detail. The rule broadly stated by the Court is that he who decides must hear. As we have already indicated, this does not mean that the person responsible for the decision must actually hear the testimony or even the argument. But where he has not heard the testimony or argument he must be sufficiently acquainted with the record, the argument and briefs, either directly or through summaries, to make the decision the product of his own judgment. The requisite minimum of personal examination will vary with the case and the administrative agency. In the light of the Morgan case, it is clear that the essentials of a fair hearing would be held lacking if a Board permitted subordinates to review the record and to make findings which were adopted without careful reexamination and reappraisal. On the other hand, it is equally clear that the Board need not read every word of testimony or briefs. If the Board has heard oral argu-

ment or read briefs, and has had the advantage of a summary, oral or written, of the record, and has satisfied itself as to the correctness of the inferences to be drawn either through examination of material portions of the record or through discussion with members of the review section, then by any rational standard it has both heard and decided." Handler, The Morgan Case and The National Labor Relations Board, CCH Labor Law Comm., No. 5.[96]

And is supported by a writer in the Iowa Law Review:

"The requirements of the Morgan case that administrative agencies must consider the record in issuing their orders has had little effect in the actual decisions, for not a single case has been found in which an order was actually set aside because the administrative officers or board had not considered the record. While the requirement may be valuable as a general admonition, it is scarcely capable of effective application. Even when a court may be persuaded to grant interrogatories or subpoenas, it seems extremely unlikely that any administrative official would testify that he had not considered the record at all. After an official has testified that he has considered part, though not all, of a record, how can an objective test be devised to determine whether his consideration is adequate? Moreover, while no one would deny that administrative officers should consider the record in making their decisions, it is obviously impossible for busy administrators to go minutely into such records. If it is not objectionable for judges, even justices of the Supreme Court of the United States, to employ subordinates to digest much of the record in cases brought before them, it seems no more objectionable in the case of administrative officers, so long as they realize the responsibilities of their position." Aftermath of the Morgan Decisions, 25 Iowa Law Review 622, 630.[97]

95 Jaffe, The Report of the Attorney General's Committee on Administrative Procedure, 8 University of Chicago Law Review 401; Prettyman, Report of the Attorney General's Committee on Administrative Procedure, 8 Journal of the Bar Association of the District of Columbia, 231; Jennings, Final Report of the Attorney General's Committee on Administrative Procedure, 19 Texas Law Review 436; Administrative Reform: The Report of the Attorney General's Committee and Proposed Legislation, 9 Int.Jur. Assn.Mo.Bulletin 133; Miller, Report of

Attorney General's Committee on Administrative Procedure with Respect to the Interstate Commerce Commission, 8 I.C. C.Pract.Journal 503; Hart, Final Report of the Attorney General's Committee on Administrative Procedure, 35 American Political Science Review 501.

96 Cf. Local Government Board v. Arlidge, 1915 A.C. English Law Reports, 120; Carr, Concerning English Administrative Law; Report of the Committee on Ministers' Powers (1931).

97 Accord: Administrative Tribunals—Necessity of Reading Testimony Taken

To the writer the arguments of the learned Dean and the Attorney General's Committee seem unanswerable. The judicial process connotes, if it means anything, the operation of the judge's own mind. It cannot be funneled through some other, even superior, intellect. So any sifting and analyzing that has not had the approval or disapproval of the litigants does involve the mental processes of others than the persons designated in the statute. On the other hand, if either the approval of the compression or the disapproval thereof has been winnowed through the thoughts of the Board members, they are functioning with the help of subordinates and are not simply beginning where the latter left off.[98]

Even from the practical point of view such a requirement does not seem to this writer unreasonable. The burden is more imaginary than real. The mass of material is first foreshortened by the intermediate report and the exceptions thereto. Clearly the triers need only read the portions about which there is a discord and so which are objected to by exceptions and subsequent oral argument. If the review attorney's memoranda are submitted to the parties and made subject to similar exceptions, I think that that system is then bent to a golden mien.[99] It is true that another step is introduced and so a small amount of additional time consumed. The writer thinks its expenditure worth the resulting assurance to both master and servant that they are receiving justice filtered through the minds of Presidential appointees confirmed "by and with the advice and consent of the Senate",[100] rather than at the hands of a group of anonymous members of the Bar appointed by an administrative agency without anybody's advice and consent.

## On Petition for Rehearing and Settlement of Decree.

Before BIGGS, MARIS, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

The respondent has filed a petition in the nature of a petition for a rehearing for the purpose, particularly, of moving this court to delete from our original opinion the statements therein contained that "the question of the reorganized company's responsibility for its unfair labor practices while debtor in possession is presently academic" and that "The record discloses conduct on the part of the respondent, following its emergence from the reorganization proceeding, of itself sufficient to sustain the charges of the complaint." The respondent concedes that the record justifies a finding "that the Management of the Respondent had thus recognized the Federation [the company union] as the bargaining agent of Baldwin employees during that period [i. e. between September 23, 1938, the date of Baldwin's discharge from the reorganization proceeding, and December 21, 1938, the date of the filing of the Board's complaint]." Indeed, the testimony not only warrants such a finding [1] but also that Baldwin's recognition of and dealings with

---

By Examiners, 1940 Wisconsin Law Review No. 1, p. 125.

[98] Cf. Bill Proposed by the Section of Judicial Administration of the American Bar Association, "To Prescribe Certain Uniform Rules of Practice For Administrative Agencies and to Provide a Uniform Method of Reviewing Their Determinations.

"*Examination of Evidence by Agency.* Whenever in a contested case, it shall be impracticable for all of the persons who are required by law to make or join in the decision to read or hear all of the evidence or agreed abstract thereof, such decision shall not be made until after a tentative draft of said decision, including such findings of fact as are required by paragraph (4) of this section, shall have been prepared by a member or examiner or employe of the administrative agency and shall have been furnished to all parties of record and opportunity shall have been afforded to each such party to file exceptions orally or in writing, or both, before all of the persons who are to participate in the decision of the case." 64 American Bar Association Reports, pp. 432–433.

[99] Administrative Law—Requirements of "Full Hearing", 37 Michigan Law Review 597.

[100] 29 U.S.C.A. § 153(a).

[1] The witness Trestrail, the financial secretary (and after November 1938 the acting recording secretary) of Federation and an employee of Baldwin Locomotive Works for thirty-eight years, testified as follows with respect to the periodic meetings between the Baldwin management and the board of directors of the Federation provided for by the contract of October 2, 1937 (made by the Federation with Baldwin Locomotive Works while in bankruptcy):

"Q. The periodical meetings with the management and the board of directors of the Federation have occurred, do I un-

the Federation continued down to and during the hearing on the complaint,[2] months after the company's discharge as a debtor in bankruptcy.

It is true that the Board's findings with respect to the unfair labor practices for which it held the respondent accountable related to practices of the company while it was operating its plant and business as debtor in possession. In that connection, we held that the labor policy of the company while debtor in possession was, as a matter of law, to be imputed to the respondent after its emergence from the reorganization proceeding, no substantial or material change in management or policy having taken place. Furthermore, we think that what the law thus implies, the facts fully confirm. The respondent's labor policy was neither a sporadic nor detached matter; and what had gone before, the respondent both ratified and projected into the future by continuing to recognize and accredit the Federation after reorganization. The attitude thus implied is available upon review as independent justification for the Board's order against the respondent regardless of

any legal discrimination between the company's status while debtor in possession and after its discharge from bankruptcy. We therefore can see no reason for deleting the statements in our original opinion as the respondent now urges. The petition for rehearing is accordingly denied.

The petitioner and the respondent have each submitted a proposed form of decree for the enforcement of the Board's order. An examination of the two forms discloses that the parties differ only with respect to the verbiage of paragraph 1(c) and paragraph 2(b) of the form submitted by the Board.

In order to admit of the direction in paragraph 1(c), which, under the original opinion of this court, the decree of enforcement should include, and yet not preclude the respondent from disputing elsewhere this court's legal conclusion with respect to the respondent's accountability for the labor relations existing while it was a debtor in possession of its business and property in bankruptcy, we direct that paragraph 1(c) of the Board's form of decree be modified so as to read as follows:

---

derstand correctly, on Tuesdays, did you say that, Mr. Trestrail? A. The first Thursday of the month.

"Q. Once a month? A. For the three —let me be more exact. The four meetings were had with the management since the existence of the contract—we stayed away for the first eight or ten months of the contract.

"Q. You were to meet once a month with the management; is that correct? A. It did not say once a month. It says 'periodical meetings'.

"Q. And you said you had four of these once-a-month meetings with the management? A. Approximately.

"Q. Starting June 10, 1938? A. Sir?

"Q. Starting shortly after June 10, 1938? A. I would say, about June, yes, June or July.

"Q. Down to the present date? A. The past meeting arranged with the management was on a Thursday, that the three or four of the board was not working, and I was here in Philadelphia at this trial. For some reason there was not sufficient members of the Board employed at that time. We started off and had it on Friday. It is the practice at the plant now that George Hurt, Walter Brown, Lou Miller, James Keeney, Robert Elliott, that their particular department is working three or four days a week, and the days they are off happen to be on a Monday and Friday, so we did not feel we wanted to put them to

working short time, and with the expense of carfares to Eddystone, and the last meeting was when I was brought up here Thursday, two weeks ago, I believe.

"Q. Where do the Federation of Baldwin Employees meet with the management? A. The directors all quit work at four-thirty, and meet the management at 4:45 or five o'clock in a board room located in the second floor of the Executive Building." (Board's Appendix, pp. 108–109)

[2] The witness Ward confirmed the maintenance of the Federation in the year following Baldwin's discharge from the reorganization proceeding when he testified:

"Q. I show you what is in evidence as Board's Exhibit No. 99, and ask you, is that your name, John Ward? A. Yes.

"Q. Now, does that refresh your memory as to whether or not you were a shop representative for the Federation of Baldwin Employees? A. Correct.

"Q. And was that in 1938 that you were shop representative for the Federation of Baldwin Employees? A. Yes.

"Q. And was that in 1937 that you were a representative for the Federation of Baldwin Employees? A. I can not recall whether it was in 1937 or not.

"Q. Was it also in 1939 that you were a representative for the Federation of Baldwin Employees? A. Yes.

"Q. And you still are? A. I still am." (Board's Appendix, pp. 441–442)

"1. * * *

"(c) Giving effect to the contract of October 2, 1937, with Federation of Baldwin Employees, the amendment and supplement thereto of February 14, 1938, any modification thereof, or any new contract to like effect concerning grievances, labor disputes, rates of pay, wages, hours of employment, or other conditions of employment, which may have been made with Federation of Baldwin Employees;"

We further direct that paragraph 2 (b) of the Board's form of decree be modified by deleting therefrom the last three lines thereof, beginning with the words "deducting, however," so that that paragraph will conform to the directions in this court's original opinion. In arriving at the amount of a back pay award (since Republic Steel Corporation v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L. Ed. 6), the interim earnings elsewhere of a reinstated employee should be taken to include wages for work performed by him while employed on work-relief projects sponsored by governments or governmental agencies. Consequently, the direction that in determining a back pay award there shall be deducted, from the amount otherwise due the employee, moneys received by him for work performed on work-relief projects is not only unnecessary but superfluous. The deductions for earnings automatically embrace all moneys received by the reinstated employee as earnings during his lay-off or discharge.

The Board's form of decree will be modified accordingly.