## CONSOLIDATED EDISON CO. OF NEW YORK, Inc., et al. v. NATIONAL LABOR RELATIONS BOARD.*

### Nos. 177, 178.

Circuit Court of Appeals, Second Circuit. March 14, 1938.

Whitman, Ransom, Coulson & Goetz, of New York City (William L. Ransom, of New York City, Wesley A. Sturges, of New Haven, Conn., and Pincus M. Berkson, of New York City, of counsel), for petitioners Consolidated Edison Co. and others.

Isaac Lobe Straus, of Baltimore, Md., and Claude A. Hope and Delafield, Thorne & Marsh, all of New York City, for petitioners International Brotherhood of Electrical Workers and others.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Laurence A. Knapp, all of Washington, D. C., Samuel Edes, of Philadelphia, Pa., and H. Gardner Ingraham, of Washington, D. C., for respondent.

Louis B. Boudin, of New York City, for Intervener United Electrical & Radio Workers of America, C. I. O.

James J. O'Brien, of Philadelphia, Pa., amicus curiae.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

In May, 1937, United Electrical & Radio Workers of America, Local 1212, a labor organization which we shall call United, filed with the National Labor Relations Board a charge that Consolidated Edison Company of New York and its affiliated companies (together referred to as petitioners) were engaging in unfair labor practices. On May 12th the Board issued its complaint against the petitioners. Appearing specially, they challenged the Board's jurisdiction, and moved that the jurisdictional question be decided prior to hearings on the merits. This request was denied. The petitioners then answered, reserving their jurisdictional objections, and hearings were had before a trial examiner designated by the Board. Before the trial examiner had made findings of fact or filed a report, the case was transferred to the Board. On November 10, 1937, the Board issued a cease and desist order based on its finding of violations of section 8(1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3). Pursuant to section 10(f), 29 U.S.C.A. § 160(f), the petitioners brought the order to this court for review. A similar petition for review was also filed by the International Brotherhood of Electrical Workers and numerous local unions (together referred to as the Brotherhood). The Brotherhood is affiliated with the American Federation of Labor, while United is connected with the Committee for Industrial Organization. The Brotherhood had not intervened before the Board but regards itself as a "person aggrieved" by provisions of the order which affect it. In its answers to the petitions the Board prays for enforcement of its said order. United has appeared as an intervener in support of the Board's order.

The first question to be considered is that of the Board's jurisdiction. Section 10(a) of the act, 29 U.S.C.A. § 160(a), empowers the Board "to prevent any person from engaging in any unfair labor practice (listed in section 158) affecting commerce." The terms "commerce" and "affecting commerce" are defined in section 2(6) and (7), 29 U.S.C.A. § 152(6, 7). It is not contended that the petitioners are themselves engaged in commerce as so defined. They

are local public utility corporations and their production and distribution of electricity, gas, and steam are carried on solely within the city of New York and adjacent Westchester county. The contention of federal jurisdiction over the labor relations of such employers is rested upon the argument that an interruption of their business by an industrial labor dispute would vitally affect commerce, because (1) in producing electric energy, gas, and steam they use large quantities of raw materials originating outside the state of New York, and (2) some of their customers are engaged in interstate or foreign commerce or are instrumentalities of such commerce.

The facts are not in dispute; they were stipulated in great detail. A brief summary will suffice for present purposes. Consolidated Edison Company of New York is both an operating and a holding company; it owns between 90 and 100 per cent. of the voting stock of each of six affiliates, its copetitioners. The parent corporation and each of its subsidiaries, with one exception, is a public utility company within the meaning of the Public Service Law of New York, Consol.Laws, c. 48, and is subject to regulation by the state commission. The one exception is Consolidated Telegraph & Electrical Subway Company, which maintains and leases to others of the petitioners space in subsurface ducts. The petitioners' labor relations are also subject to state regulation under a recent statute, chapter 443, Laws N.Y.1937, unless jurisdiction of the state labor relations board must yield to that of the national board. The petitioners are operated as a unitary system. A few figures will indicate the magnitude of the system's business. In 1936 it supplied 97.5 per cent. of all electric energy sold in New York City, and practically 100 per cent. of that sold in Westchester county; it supplied 55.3 per cent. of the total gas sold in New York City, and is the only utility supplying gas in Westchester county. It is the only central-station steam utility in New York City. Its employees number more than 40,000 and its total pay roll in 1936, including annuities and separation allowances, was nearly $82,000,000. It used almost 5,000,000 tons of coal and more than 114,000,000 gallons of oil in the year 1936. All of the oil and all but an insignificant portion of the coal moved to the petitioners' plants from states other than New York. The out-of-state purchases are made from independent dealers and are delivered by independent carriers. Although the bulk of the petitioners' business, in respect to both the quantity of service and the number of consumers, is supplying electricity and gas for residential and local commercial uses, they also have numerous consumers who are engaged in interstate or foreign commerce. The most striking illustrations of this class of consumers are the railroads. Thus, electric energy supplied to the New York Central, the New York, New Haven & Hartford, and the Hudson & Manhattan is used for the lighting and operation of their passenger and freight terminals and for the movement of interstate trains; and steam supplied to the Pennsylvania Railroad Company is used to operate switches in its tunnel under the Hudson river.

■ The construction and validity of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., was extensively discussed in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. As the Chief Justice there pointed out, the act does not impose collective bargaining upon all industry regardless of effects upon interstate or foreign commerce. It purports to reach only what may be deemed to obstruct or burden such commerce. At page 37 of 301 U.S., 57 S.Ct. 615, 624, 81 L.Ed. 893, 108 A.L.R. 1352, the opinion states: "Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control. Schechter Corp. v. United States, supra [295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947]. Undoubtedly the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government. Id. The question is necessarily one of degree."

■ Consistently with these principles it can scarcely be doubted that the labor disputes of a local merchant will not normally fall within the Board's jurisdiction, even

though some part of his stock in trade originates outside the state or some of his local customers are engaged in interstate commerce. In such a case the closing of the merchant's store by a strike of his employees would undoubtedly affect interstate commerce, but the effects would be too remote and indirect to bring his activities within the range of federal regulation. We need not say whether the same conclusion would follow if the merchant's importations from without the state ran into figures comparable to the petitioners' importations of coal and oil. Nor need we decide whether their importations of raw materials are alone enough to bring them under the Board's jurisdiction. It is the use which some of their customers make of the electric energy and steam purchased from the petitioners that furnishes the Board its main ground for claiming jurisdiction. The petitioners argue that they should not be chargeable for the independent acts of customers whom, by state law, they are compelled to serve. But the problem is not to be approached from the standpoint of vicarious liability. It is to be approached as a question of fact, namely, what will be the result upon commerce of a labor dispute between the petitioners and their employees. Should such a dispute result in interrupting the petitioners' service, the effects upon commerce would be catastrophic. We mention only some of them. Instantly, the terminals and trains of three great interstate railroads would cease to operate; interstate communication by telegraph, telephone, and radio would stop; lights maintained as aids to navigation would go out; and the business of interstate ferries and of foreign steamships, whose docks are lighted and operated by electric energy, would be greatly impeded. Such effects we cannot regard as indirect and remote.

 It is true that the local consequences of a cessation of the petitioners' services would be equally, if not more, disastrous. It is argued that considerations of the health, safety, and convenience of the millions of people who live and work in New York City outweigh the national interest in protecting interstate commerce from disruption; that local public utilities have always been regarded as exclusively within the jurisdiction of the states; and that to extend the federal jurisdiction to include them is to obliterate pro tanto our dual system of government, contrary to the admonition of the Chief Justice in the Jones & Laughlin Case. We are not unmindful of the persuasive force of these arguments. Nevertheless, we cannot doubt the power of Congress to legislate with respect to local utilities the disruption of whose service would have a direct effect upon interstate commerce; cf. Appalachian Elec. Power Co. v. National Labor Rel. Board, 4 Cir., 93 F.2d 985; nor can we doubt that the act under consideration was intended to exert federal power under the commerce clause, Const. art. 1, § 8, cl. 3, to the full extent of constitutional limits. This is not to say that all utilities are within the act. "The question is necessarily one of degree." In the case at bar the effect of disrupting service would be of such magnitude and so immediate that we think the petitioners are within the Board's jurisdiction, even though only a small percentage of their total business is used in interstate or foreign commerce.

None of the Labor Board cases decided by the Supreme Court has presented a situation like that at bar. In three of them the Board's order ran against an employer whose business, though local in respect to manufacturing, was plainly interstate in respect to sales of a very large percentage of its manufactured product. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L. Ed. 893, 108 A.L.R. 1352; National Labor Board v. Fruehauf Co., 301 U.S. 49, 57 S.Ct. 642, 81 L.Ed. 918; National Labor Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921. In one case the employer was engaged in a business of interstate communication (Associated Press v. National Labor Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953); in others the business was interstate transportation of passengers (Washington V. & M. Coach Co. v. National Labor Board, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965; National Labor Relations Board v. Pennsylvania Greyhound Lines, 58 S.Ct. 571, 82 L.Ed. ——; National Labor Relations Board v. Pacific Greyhound Lines, 58 S.Ct. 577, 82 L.Ed. ——). We recognize that these cases are not decisive of the case at bar, but we think that the principles they have announced point to the conclusion we have reached.

 The petitioners contend that the Board denied them a full and fair hear-

ing according to due process of law. This complaint is based upon four grounds. The first relates to the Board's direction that the proceeding be transferred to it pursuant to Rule 37. The result was that the trial examiner made no intermediate report, as contemplated by Rule 32, and the petitioners had no opportunity to file exceptions to his report as contemplated by Rule 34. Nor were they accorded oral argument before the Board, although it must be presumed that their brief submitted to the trial examiner came to the Board's attention. This procedure is not one likely to inspire confidence in the impartiality of the proceedings. It results in the findings of fact being made by persons who did not see the witnesses—a matter which may have far-reaching consequences in view of the very limited power conferred upon the courts to review the Board's findings of fact. But, though we do not commend such procedure, we cannot say that it has deprived the petitioners of due process of law. Const. Amend. 14. It is familiar practice for a court to decide issues on testimony wholly taken by deposition; and section 10(c) of the act, 29 U.S.C.A. § 160(c), places upon the Board the duty of stating its findings of fact "upon all the testimony taken." Nor do we think the Board is bound to hear oral argument if it prefers to take a brief. Morgan v. United States, 298 U.S. 468, 56 S. Ct. 906, 80 L.Ed. 1288, presented a very different situation.

The second ground of complaint is that the trial examiner permitted amendments, thereby introducing issues which necessitated the presence of an absent party, namely, the Brotherhood. As will appear from subsequent discussion, we do not regard the Brotherhood as a necessary party.

The third ground relates to the examiner's refusal to accept testimony relating to the petitioners' reasons for discharging an employee named Solosy. This will also be discussed later.

 Finally, complaint is made that remote hearsay dominated the testimony. This court has already ruled that hearsay is admissible in hearings before the Board. National Labor Relations Board v. Remington-Rand, 2 Cir., 94 F.2d 862, February 14, 1938. Whether some of the hearsay was too remote to be entitled to credence goes to the correctness of the Board's findings rather than to the constitutional validity of its proceedings. For the foregoing reasons the petitioners' contention that they have been denied due process of law is overruled.

We pass now to the merits of the controversy. The Board's findings of fact, conclusions of law, and order are too voluminous to be incorporated in this opinion. The complaint, as amended, charged the petitioners with the following unfair labor practices: (1) The use of undercover operatives to spy upon union activities of employees, in violation of section 8(1), 29 U. S.C.A. § 158(1); (2) the discriminatory discharge because of union activities of six employees, in violation of section 8(3), 29 U.S.C.A. § 158(3); and (3) coercion of their employees in their right to form labor organizations of their own choosing in violation of section 8(1) and (2), 29 U.S. C.A. § 158(1, 2). The Board sustained the charges based on section 8(1) and (3) but dismissed the charge based on section 8(2).

 The most important of the charges is the one referring to coercing the employees into joining the Brotherhood. In the latter part of 1933 and the early part of 1934 the petitioners sponsored and assisted in the formation of certain Employee Representation Plans among their employees. They were company-dominated unions. Immediately after the validity of the National Labor Relations Act was sustained by the Supreme Court, Carlisle, who was in charge of the petitioners' labor policy, conferred with Tracy, the international president of the Brotherhood, and on April 16, 1937, Tracy wrote him a letter demanding recognition of the Brotherhood as the representative of its members, and sending a proposed contract. On April 20 Carlisle called a meeting of the chairmen of all the general councils of the Plans and announced that the management could no longer continue financial support to the Plans, but had decided to recognize the Brotherhood. He said that the employees were expected to join the Brotherhood and he referred to it as the "sole bargaining body" for employees of Consolidated Edison Company. On the same date Carlisle replied to Tracy's letter, agreeing to recognize the Brotherhood and to negotiate contracts with it, although at this time the number of its members among the petitioners' employees was insignificant. Shortly thereafter there were set up seven

Brotherhood locals, most of the officers of the Plans becoming officers of the locals. During the same period United was endeavoring to gain members among the petitioners' employees. An officer of United wrote Carlisle for a conference, but no answer was made to this letter. Without specifying further details, it will suffice to say that there was ample evidence to support the Board's finding that the petitioners exerted pressure on their employees to join the Brotherhood, while they discouraged membership in United. Between May 28 and June 16 they entered into substantially similar contracts with the seven locals of the Brotherhood. The contracts were introduced by the petitioners in support of a contention that the issue of coercion of employees was thereby rendered moot. The contracts in terms recognized the Brotherhood as the representative of its members and were applicable only to such members. As of June 29, 1937, their membership was 30,000 out of 38,000 eligible employees. Paragraph 1(f) of the order under review directs the petitioners to cease and desist from "giving effect to their contracts with" the Brotherhood. Strenuous objection to this provision of the order is made both by the petitioners and by the Brotherhood.

■ They both urge that the Brotherhood was a necessary party to the proceeding if the Board's order is to invalidate these contracts. This contention has been authoritatively determined against them by the recent decision of the Supreme Court. National Labor Relations Board v. Pennsylvania Greyhound Lines, 58 S.Ct. 571, 82 L.Ed. ——, announced February 28, 1938. The order does not run against the Brotherhood. Its presence was not necessary to enable the Board to determine whether the act had been violated or to make an appropriate order against the petitioners.

■ It is not so clear, however, that invalidating the contracts is an appropriate order against the petitioners. Unlike the Greyhound Lines Case, the Board has here dismissed the charge under section 8(2), 29 U.S.C.A. § 158(2), which forbids an employer "To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." Since the Brotherhood is not dominated, supported, or interfered with by the petitioners, it is not immediately obvious that the employees' right to self-organization will be injured by allowing the contracts to be carried out. Under them, the Brotherhood acts only for its own members, and clause 1(g) of the order restrains the petitioners from recognizing it as the exclusive representative of their employees. Other subdivisions, namely, 1(a), (b), (c), (d), (e), and (h), restrain them from urging their employees to join any labor organization, or interfering with their free exercise of self-organization, or favoring the Brotherhood or any other labor organization. Under these provisions the employees will have complete freedom to join United in preference to the Brotherhood, or to join neither. But the Board concluded that, "in order to establish conditions for the exercise of an unfettered choice of representatives" by the petitioners' employees, the petitioners should be ordered to cease and desist from giving effect to the contracts. We do not think that this conclusion is so unwarranted as to necessitate deleting clause (f) from the order. However, since the Board has found no reason for "disestablishing" the Brotherhood, as was done in the Greyhound Lines Case, it would seem to be entirely lawful for the petitioners and the Brotherhood to make new contracts on behalf of its own members, once the employees have been notified that the old contracts are not binding and that they are free to join or refrain from joining any labor organization; and the new contracts may be on the same terms as the old. We see nothing in the order to prevent that.

■ The Board has found that the petitioners discharged six employees because of their union activities contrary to section 8(3) of the act, 29 U.S.C.A. § 158(3). Three of the men were discharged November 29, 1935, and two on June 19, 1936. All five were officers or active leaders of Local 103 of the Brotherhood of Utility Employees, which later became affiliated with United. The petitioners presented testimony that these men were discharged because it was necessary to reduce the size of two departments in which they worked; that in making such reductions preference was given to married employees; and that these men were single and were treated no differently than others, both union and non-union, who were laid off about the same time. The Board rejected this explanation chiefly, it would seem, because other single men with less seniority of service were re-

tained. The question is not whether this court would have reached the same conclusion as the Board, but whether there is evidence to support the Board's findings. Section 10(e), 29 U.S.C.A. § 160(e). We cannot say that the record is wholly barren of evidence to support the charge that they were discriminated against on account of union activities. Hence the order requiring that they be reinstated and made whole for losses sustained by reason of their discharges must stand. This does not mean that the petitioners must employ these five men in addition to their present employees, if the work to be done does not require additions to their force, for the petitioners are at liberty to discharge an equal number of other employees for proper reasons.

The sixth discharge complained of is that of Solosy, who was laid off January 17, 1936. The reason given him was the shutting down of the "A" plant of the Astoria Light, Heat & Power Company. It was in fact shut down. Other employees in his division, of less seniority, were retained. In his case, also, the Board found that in reality his discharge was because of his union activity. Solosy's case differs from the others in that the petitioners were not allowed to introduce certain, evidence as to the circumstances surrounding his discharge. This situation arose as follows: The Board unexpectedly completed its proof on June 24, 1937. Counsel for the petitioners was unready to go on and obtained a continuance in order that Messrs. Carlisle and Dean, who were absent from the city, might testify on July 6th. The examiner and the Board (by letter) declined to let any other witnesses testify on that date. Counsel offered two of Solosy's supervisors to testify to the reasons for his discharge and to the fact that the men who were retained in preference to him were better educated and better trained. These witnesses were at hand, their testimony would have been short, and would have entailed no appreciable delay in closing the hearings. It was vital testimony on the issue of the petitioners' motive in discharging him. Denial of leave to introduce it appears to us unreasonable and arbitrary. However, the petitioners have not applied to this court for the taking of additional evidence, as they might under section 10(e), 29 U.S.C.A. § 160(e).

An order of this court may be entered for enforcement of the Board's order.