NATIONAL LABOR RELATIONS BOARD v. LOCAL 74, UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, A. F. of L. et al.

No. 10943.

United States Court of Appeals, Sixth Circuit.

April 4, 1950.

Albert M. Dreyer, Washington, D. C. (Robert N. Denham, David P. Findling, A. Norman Somers, and Dominick L. Manoli, Washington, D. C., on brief), for petitioner.

Charles H. Tuttle, New York City (Francis X. Ward, Indianapolis, Ind., and Daniel F. O'Connell, New York City, on brief), also on docket, Herbert G. B. King, Chattanooga, Tenn., for respondents.

Before HICKS, Chief Judge, and ALLEN and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order directing

Local 74, United Brotherhood of Carpenters and Joiners of Ameria, A. F. of L., and its business agent, Jack Henderson, to "cease and desist from engaging in or inducing the members of Local 74 to engage in a strike or a concerted refusal in the course of their employment to perform services for any employer, where an object thereof is to require any employer or other person to cease doing business with Ira A. Watson, doing business as Watson's Specialty Store."

. The authority for issuance of the Board's order is rested upon the following provisions of section 8(b) (4) (A) of the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U.S.C.A. § 141 et seq.: "Sec. 8 * * * (b) It shall be an unfair labor practice for a labor , organization or its agents— * * * (4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * * *." 158(b) (4) (A), Title 29 U.S.C.A.

The Labor Board adopted the finding of the trial examiner that the respondent labor union and its business agent violated this section of the United States Code by participating in and inducing a strike at the residence of George D. Stanley near Chattanooga, Tennessee, with an objective of forcing him to cease doing business with Ira A. Watson Company, operating under the trade name "Watson's Specialty Store", which was found to be engaged in interstate commerce within the meaning of the Act.

In acting upon the petition of the Labor Board, this court must adhere to the mandate of Congress that the findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. See section 10(e) of the Act, § 160(e), 29 U.S.C.A.

The Ira A. Watson Company operates some 26 or 27 retail stores in seven different states. In February, 1947, it discontinued its general retail store in Chattanooga, Tennessee, and in March of that year opened Watson's Specialty Store, specializing, as a part of its operations, in the sale and installation of floor and wall coverings. From March to September, 1947, the Watson store purchased goods valued at approximately $93,000, of which some thirty-three percent represented purchases shipped to it in Chattanooga from states other than Tennessee, around thirty percent was material purchased through local sources but manufactured outside the state and shipped to distributors in Tennessee, and approximately thirty-five percent represented stock received from the closed Chattanooga general store. Most of such stock originated outside Tennessee. Watson's sales and installation jobs during this period amounted to around $100,000, whereof an approximated eight percent represented sales and installations in states other than Tennessee.

When Watson's Specialty Store was first opened, respondent Henderson, business agent for Local 74, tried to persuade Watson's installation employees to join the union; but they refused. Thereafter, Henderson requested Smith, manager of the store, to execute a closed shop contract with Local 74 as the bargaining agent of the installation employees. This, the store manager refused to do for the reason that the employees were not union members. Whereupon, the union began to picket the store. Though the picketing was conducted by persons not in the employ of Watson's, the Labor Board held that it was not unlawful.

Early in August, 1947, while the picketing was in progress, Stanley, who had purchased an old residence some eight miles from Chattanooga, contracted with D. F. Parker to improve and renovate the house. The contract provided that Parker should

furnish the material and sufficient workmen to complete the job not later than August 15, 1947. Stanley obligated himself to pay the wages of the workers and the cost of necessary material, and to pay Parker **a** commission of ten per cent of the cost of such items and other expenditures necessary for the completion of the job.

All workmen hired by Parker were union members, including carpenters who were members of Local 74. In the course of the renovation, it became necessary to select floor and wall coverings for the house and neither Parker nor Stanley was able to find the type of coverings satisfactory to Stanley at any establishment in Chattanooga except Watson's store, which insisted upon installing the coverings sold by it. Parker discussed with Stanley the complications that might arise with the union employees if Watson's non-union men should install the coverings, with the result that it was agreed that Watson's men should do their work when the union men were off duty. Stanley then entered into a contract by letter with Watson's store for the purchase and installation of the floor and wall coverings.

The installation work was started on Sunday, August 17, when there were no union workers present. However, on the ensuing Monday, Tuesday and Wednesday, Watson's employees continued the installation during regular working hours when the union men were also on the job. On Thursday morning, August 21, Watson's store, at Parker's request, took its men off the job. Despite this, Business Agent Henderson appeared at the Stanley place Thursday afternoon and told the four union carpenters then working that they could not continue to work with non-union men, or where non-union men were employed. The union carpenters left the job that afternoon and did not return. Stanley sought unsuccessfully to have Henderson countermand his instructions. The Board found that, "according to Stanley's credible testimony, Henderson suggested that Stanley cancel his contract with Watson as a means of getting the carpenters to return to work."

■ There was substantial evidence to support this finding, for Stanley testified that, in appealing to Henderson on the spot to let the union carpenters finish the job, he begged: "Just what will I have to do? I'm willing to do anything to get into this house. I haven't a place to live and I've paid for this house and my wife's health is in bad condition and we need to get in." To this importunity, he swore that the union's business agent replied: "Go—if you cancel your contract with Watson and get union men to to [sic] your job, we'll go back to work." And, on cross-examination, Stanley testified that when he asked Henderson what he could do to get the business agent of the union to let his men finish the job, Henderson replied: "If you cancel your contract with Watson's." When pressed, Stanley stood fast to his statement that these were the "exact words" Henderson used. He stated positively that cancellation of his contract with Watson was the final condition imposed by Henderson under which "he would allow his men to continue the job."

Two or three days later, the men from Watson's store returned to the job and completed their work about August 28. All the renovating of the Stanley house was completed by the end of the month. The unfinished carpentry was, at the urgent request of Parker, completed by two of the four union carpenters who had been on the job. They did this completion work without the knowledge or consent of the respondents.

■ The Labor Board held that Watson's, a large chain store operating in seven states, is, as was found by the trial examiner, engaged in commerce within the meaning of the Act. The following decisions of the Supreme Court were cited as authority: National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 604, 605, 59 S.Ct. 668, 83 L.Ed. 1014; Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122; Polish National Alliance of U. S. v. National Labor Relations Board, 322 U.S. 643, 648, 64 S.Ct. 1196, 88 L.Ed. 1509.

We think the Labor Board correctly decided the point. Indeed, the opinion of this

130

court in National Labor Relations Board v. J. L. Hudson Co., 6 Cir., 135 F.2d 380, certiorari denied 320 U.S. 740, 64 S.Ct. 40, 88 L.Ed. 439, though not cited by the Board either in its opinion or in its brief filed with us, justifies its ruling. The Court of Appeals for the Eighth Circuit has approvingly cited our opinion in two cases. J. L. Brandeis & Sons v. National Labor Relations Board, 142 F.2d 977, 979, 981; and National Labor Relations Board v. May Department Stores Co., 146 F.2d 66, 68, affirmed, with modification not pertinent here, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145.

In the J. L. Hudson Company case, we held that where more than eighty percent of the total value of merchandise purchased by a very large retail store was shipped in interstate commerce and one and sixtenths percent of its total sales were shipped to customers in interstate commerce, the retail store was subject to the jurisdiction of the National Labor Relations Board, contrary to the same contention made here that the retailer's activities did not affect interstate commerce. The fact that, in the instant controversy, the operations of the Watson store were much smaller in scope than were those of the J. L. Hudson Company in Detroit does not differentiate the case, for the record here shows that approximately eight percent of Watson's sale-and-installation jobs were outside the State of Tennessee, and its purchases of goods from outside that state amounted to approximately thirty-three percent of its total purchases.

■ We deem it unnecessary to repeat the discussion pertaining to the interstate commerce feature in which we indulged in the J. L. Hudson Company case, where we analyzed the opinions of the Supreme Court in the Jones & Laughlin, Fainblatt, and Filburn cases cited by the Board in its opinion, discussed other opinions of the Supreme Court and cited decisions from numerous circuit courts of appeals. It should suffice to restate one of our paragraphs: "The Supreme Court, since promulgation of its opinion in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893, 108

A.L.R. 1352, has adhered to the doctrine that activities, intrastate in character when separately considered, if so closely and substantially related to interstate commerce that their control is essential or appropriate for the protection of interstate commerce from burden or obstruction, fall within the ambit of control by Congress." 6 Cir., 135 F.2d 382. The sweeping concept of the regulatory power of Congress in the constantly expanding scope of the interstate commerce clause, as construed by the Supreme Court in recent decisions, we emphasized by citation, not only of the cases previously mentioned, but also of United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726, and A. B. Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638. To this list should now be added an extremely strong example, Martino v. Michigan Window Cleaning Co., 327 U.S. 173, 66 S.Ct. 379, 90 L.Ed. 603, reversing the decision of this court reported in 6 Cir., 145 F.2d 163. See also Mandeville Island Farms v. Crystal American Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328.

In a case not distinguishable in principle from the case at bar and bearing analogy in fact, the Court of Appeals for the Tenth Circuit has held that a secondary boycott against a contractor engaged solely in intrastate activities to compel it to cease doing business with a manufacturer engaged primarily in interstate business constituted an unfair labor practice under section 8(b) (4) (A) of the National Labor Relations Act, as amended by the Labor Management Relations Act of 1947. United Brotherhood of Carpenters, etc. v. Sperry, 170 F. 2d 863, 868.

■ It would seem that respondents treat this controversy as if it were merely one between Stanley and union workers concerning wages, and ignore the Board's finding of fact based upon substantial evidence that the purpose of the ordered walk-out was to force Stanley to cease doing business with Watson's and thus conduct an illegal secondary boycott against a concern a part of whose business was interstate commerce. In both cases emphasized by respondents, the orders of the National Labor

Relations Board were enforced, it being found that the operations of the respective electric utility companies engaged in distributing power wholly within a state so affected interstate commerce as to fall within the ambit of the National Labor Relations Act. Consolidated Edison Co. of New York v. National Labor Relations Board, 2 Cir., 95 F.2d 390; Southern Colorado Power Co. v. National Labor Relations Board, 10 Cir., 111 F.2d 539.

■ The respondents contend that their decision taken during working hours on August 21 to discontinue work at Stanley's residence in accordance with the working rules and practices of the union was a concerted decision not to return to work the next day, and that therefore, inasmuch as section 8(b) (4) (A) did not become effective until the following day (August 22), the section has no application and the Board lacked jurisdiction to enter the order which it did. Much reliance is placed upon the decision of United States District Judge Darr, who, in denying a temporary injunction sought by a regional director of the National Labor Relations Board to restrain the respondent union from maintaining a secondary boycott against the Ira A. Watson Company, said that in his judgment "the whole employment relationship ceased to exist on August 21, 1947, and that when the Act became effective there was no unlawful situation" ; and that "the whole incident was closed". It should be noted, however, that the judge commented that he had reached the conclusion that he "should not direct the issuance of an injunction *pending the action of the Board.*" [Italics supplied.] Styles v. Local 74, United Brotherhood of Carpenters & Joiners of America, A. F. of L. et al., D.C., 74 F.Supp. 499, 501, 502. He properly recognized that his decision was not binding upon the Labor Board, which is vested with ultimate jurisdiction to determine the merits of a labor controversy of the instant character.

The Board found: "There is no substantial evidence that, when the carpenters ceased work on August 21, they intended permanently to abandon their employment at the Stanley residence; on the contrary, we are convinced that under orders from the Respondents, the carpenters merely intended to withhold their services until such time as the Respondents' demand was met." That the carpenters were not quitting the job permanently when they took away their tools on August 21 is evidenced by Stanley's testimony, heretofore quoted, that the respondent business agent Henderson told him that the men would return to work if Stanley would cancel his contract with Watson. Moreover, it must not be forgotten that two of the carpenters returned surreptitiously to complete the job, despite the order of respondents.

Inasmuch as the strike was a continuing one, the Labor Management Relations Act of 1947 is being given no retroactive effect when held applicable to the case at bar. In Jefferey-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F. 2d 134, 112 A.L.R. 948, certiorari denied 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565, it was held that the mere fact that a labor dispute began before the enactment of the National Labor Relations Act does not have the effect of withdrawing either the parties or the dispute from the regulatory power of Congress as to subsequently occurring acts. As early as 1897, the Supreme Court applied the same principle in holding that an agreement to establish and maintain future rates for transportation, though lawful when made, constituted a violation of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq., when continued in operation after certain provisions of the agreement became unlawful in consequence of the Sherman Act. United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 S.Ct. 540, 41 L.Ed. 1007.

The Labor Board based its finding that respondents were violating section 8(b) (4) (A), not upon their actions before the effective date of the Taft-Hartley Act, but in their keeping the strike order in effect after that amendatory Act of Congress became operative. As has been indicated in the foregoing discussion, we think this interpretation was correct.

■ Respondents urge that it would be violative of their union working rules not to work with non-union men had they

permitted their men to return to the Stanley job on August 22, or thereafter; that lawful observance of their working rule "once begun, could not be outlawed and the opposite rendered compulsory by subsequently effective legislation"; and that "such legislative coercion would violate the First, Fifth, Tenth and Thirteenth Amendments to the Constitution of the United States." It is true, as contended by respondents, that a union man has a constitutional right not to work with non-union men, and that "the right to sell or not to sell one's labor or services is not only a right of liberty but a right of property", protected by constitutional guarantees. But this principle is beside the point. We are not here concerned with the right of an individual worker. The order of the Labor Board directs the respondent union and its business agent, and not the union members themselves, to cease and desist from engaging in or inducing the members of Local 74 to engage in a strike or a concerted refusal, in the course of their employment, to perform services where an object thereof is to require an employer or other person to cease doing business with a specified company.

It has been held by the federal courts that an order which does not forbid the members of a labor union to stop working at will but which merely prohibits the calling of a strike by the union of which they are members does not violate any constitutional provision against involuntary servitude. See Internation Union, U. A. W., A. F. of L., Local 232, Auto. Workers v. Wisconsin Emp. Rel. Board, 336 U.S. 245, 251, et seq., 69 S.Ct. 516, where the Supreme Court pointed out that neither the Wisconsin statute nor the order of the Employment Relations Board of that state undertook to prohibit or restrict any employee from leaving the service of the employer, either for reason or without reason, either with or without notice, and made it no crime to abandon work individually or collectively; and, such being true, the contention that any action of the state had the purpose or effect of imposing any form of involuntary servitude was not well founded. The Supreme Court upheld the order of the

state labor board directing the labor union and its members to cease and desist from instigating unlawful work stoppages in the plants of an employer engaged in interstate commerce. It was held further that the Wisconsin statute did not violate the Fourteenth Amendment. Compare Lincoln Federal Labor Union No. 19129, A. F. of L., v. Northwestern Iron & Metal Co., 335 U. S. 525, 69 S.Ct. 251, 6 A.L.R.2d 473; Printing Specialties and Paper Converters Union, Local 388, A. F. L. v. LeBaron, 9 Cir., 171 F.2d 331.

An applicable authority in the instant situation is the recent opinion of the Court of Appeals for the Second Circuit in National Labor Relations Board v. Wine, Liquor & Distillery Workers Union, etc., A. F. of L., 178 F.2d 584, decided December 12, 1949, where the Labor Board had found upon sufficient evidence that an object of a work stoppage was to exert pressure, by a secondary boycott forbidden by section 8(b) (4) (A) of the Taft-Hartley Act. The court enforced an order of the Labor Board directing the union to cease and desist from inducing its members to engage in a strike or concerted refusal to perform services for any employer where an object thereof is to require the employer or any other person to cease doing business with another. The Court of Appeals rejected the contention of the union that section 8(b) (4) (A), if applicable, would be in violation of the First, Fifth or Thirteenth Amendments to the Constitution of the United States. The court pointed out, and we agree, that the unanimous opinion of the Supreme Court in the Giboney case (Giboney et al. v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684) seems to make it plain that section 8(b) (4) (A) of the Taft-Hartley Act cannot be regarded as invalid under the First Amendment to the Constitution. Likewise, the contention that the section violates the Thirteenth and Fifth Amendments was appropriately rejected; and reference was made to the same relevant cases heretofore cited or discussed.

Respondents argue that the case is moot, for the reason that the entire work

on Stanley's residence has been completed. It is insisted that the Board could not reasonably anticipate future violations and that its cease and desist order is, therefore, not justifiable. We have heretofore held such argument to be unsound. In National Labor Relations Board v. Cleveland-Cliffs Iron Co., 6 Cir., 133 F.2d 295, 300, this court said: "It has long been the rule that mere discontinuance of an unlawful practice will not relieve the court (or an administrative agency) of the duty to pass upon a pending charge of illegality, when by the mere volition of the parties the illegal practice may be resumed. United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; Southern Pac. Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 31 S. Ct. 279, 55 L.Ed. 310; Federal Trade Commission v. Goodyear Tire & Rubber Co., 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326. The order is a continuing one and may be enforced if it is disobeyed." In National Labor Relations Board v. Toledo Desk & Fixture Co., 6 Cir., 158 F.2d 426, we again held that abandonment of an illegal practice does not cause the controversy to become moot, and decreed an enforcement of an order of the National Labor Relations Board. In National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L. Ed. 831, 115 A.L.R. 307, the Supreme Court declared that an order of the Labor Board lawful when made "does not become moot because it is obeyed or because changing circumstances indicate that the need for it may be less than when made."

We find no merit in the contention of the respondents that the Board's order should not be enforced because of the *de minimis* doctrine. The probable effect of the secondary boycott against Watson's, unlawfully ordered and conducted by the respondents, is not, upon this record, a matter of inconsequential importance.

The order of the National Labor Relations Board will be enforced as prayed in its petition.